In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3430

CORNELL D. REYNOLDS,

*Petitioner-Appellant*,

*v.*

RANDALL HEPP,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 16-CV-508 — **William C. Griesbach**, *Chief Judge*.

ARGUED JANUARY 4, 2018 — DECIDED AUGUST 30, 2018

Before WOOD, *Chief Judge*, and HAMILTON and BARRETT,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. Petitioner-appellant Cornell
Reynolds seeks a writ of habeas corpus under 28 U.S.C.
§ 2254. In 2002, a Wisconsin jury convicted Reynolds in a fatal
carjacking. He seeks habeas relief based on two alleged viola-
tions of his Sixth and Fourteenth Amendment right to coun-
sel. First, he argues that Wisconsin violated his right to coun-
sel when it stopped paying his state-appointed lawyer during

his direct appeal. In the alternative, he argues that he received ineffective assistance from his counsel during his direct appeal and trial. The district court denied relief. We affirm.

I.  *Factual & Procedural Background*

In May 2001, two young men approached a group of teenagers in a parking lot in Milwaukee. One of the men shot two of the teenagers, killing one of them. The two men drove away in the car the two teenage victims had been driving. Reynolds was arrested two days later after he was identified as the shooter. Wisconsin indicted him for carjacking resulting in death, carjacking resulting in bodily harm, and possessing a firearm as a felon. A jury convicted Reynolds on all three charges. Reynolds sought relief through a direct appeal, a state post-conviction proceeding, and a state habeas corpus petition. Finding no relief in the state courts, he filed his federal habeas corpus petition. We start by summarizing the relevant facts at each stage of Reynolds's case.

A.  *Trial & Direct Appeal*

Before trial, Reynolds raised an equal protection challenge to Wisconsin's felony carjacking statute. The trial court rejected the challenge, and the case proceeded to trial. The main issue at trial was identification. The prosecution called four eyewitnesses, including the surviving gunshot victim. Each identified Reynolds as one of the two carjackers and as the shooter of at least one victim. Reynolds did not testify and did not call any witnesses. The jury convicted Reynolds of carjacking resulting in death, carjacking resulting in bodily harm, and possession of a firearm by a felon.

The Wisconsin State Public Defender's Office appointed attorney Terry Williams as Reynolds's post-conviction and

appellate counsel. With his counsel's help, Reynolds moved for a new trial on the basis that his trial counsel provided ineffective assistance and should have raised an alibi defense.[1] Reynolds submitted two affidavits describing his whereabouts on the night of the shooting. The trial court found that the affidavits did not help Reynolds since they placed him just a few minutes from the crime scene around the time of the shooting. The court denied Reynolds's motion without an evidentiary hearing, concluding that he had failed to raise facts showing ineffective assistance or prejudice to his defense.

On direct appeal, Reynolds argued that he was entitled to an evidentiary hearing on his ineffective assistance claim and added an argument that his trial counsel failed to cross-examine the eyewitnesses adequately. The Wisconsin Court of Appeals reversed and remanded with instructions to hold what Wisconsin courts call a *Machner* hearing. See *State v. Machner*, 285 N.W.2d 905 (Wis. App. 1979). On remand, the trial court held an evidentiary hearing, considered both arguments, and denied Reynolds's motion for a new trial.

Reynolds appealed again. At some point after the evidentiary hearing—and while Reynolds's appeal was pending—staff at the Wisconsin State Public Defender's Office told attorney Williams that he had spent too much time on his cases. The State Public Defender's Office informed Williams that they would not pay him for some of the work he had completed on Reynolds's appeal and that they would not pay him for any more work on the case. They also told Williams that they would no longer assign cases to him. Handling such a

---

[1] In Wisconsin, defendants generally begin their direct appeals by moving for a new trial in the trial court. See Wis. Stat. § 809.30(2)(h).

management issue by cutting off attorney Williams without taking concrete steps to ensure that his clients would continue to be represented would seem highly unusual and troubling. The record before us simply does not show what efforts the staff might have made to protect Reynolds's interests.

Reynolds did not immediately learn that the State Public Defenders had stopped paying his attorney. But when he asked Williams to pursue in the second appeal the equal protection challenge to the carjacking statute—which trial counsel had unsuccessfully raised before trial—Williams told him that the State was not paying him anymore and that he could not afford to investigate that additional question. Reynolds could not afford to pay for additional work, even assuming that Williams could have accepted private payments on top of the earlier public defender payments. The result was that Williams did not investigate the equal protection challenge as a possible argument on appeal. Nevertheless, Williams completed briefing in the Wisconsin Court of Appeals on the ineffective-assistance claims and later filed a petition for review with the Wisconsin Supreme Court. The Court of Appeals affirmed the denial of a new trial, and the Wisconsin Supreme Court denied review.

B. *Collateral Post-Conviction Relief*

In October 2010, Reynolds filed a pro se collateral post-conviction motion in the trial court under Wis. Stat. § 974.06. As relevant here, Reynolds argued that he received ineffective assistance of appellate counsel because attorney Williams failed to argue that his trial counsel should have challenged the jury instructions on carjacking. The formal charging instrument had said that Reynolds took the vehicle "by use of" a dangerous weapon, but the jury was instructed to convict

even if it found that he took the car by only "threat of the use of a dangerous weapon." Reynolds argued that the jury should have been instructed using the language in the formal charges and that Williams was ineffective for not raising this argument on appeal.

The trial court denied the motion without a hearing, and the Wisconsin Court of Appeals affirmed. The appellate court first found that Reynolds's claim for ineffective appellate counsel was conclusory and, therefore, procedurally barred under *State v. Escalona-Naranjo*, 517 N.W.2d 157 (Wis. 1994). In the alternative, the court found that the jury instructions were sufficient to support a conviction under Wisconsin law because the carjacking statute establishes a single offense that can be committed by using or threatening to use a weapon. See Wis. Stat. § 943.23(1g) (defining carjacking as intentionally taking "any vehicle without the consent of the owner" by "the use of, or the threat of the use of, force" or a dangerous weapon). The court also found that even if the jury instructions were improper, Reynolds could not prove prejudice. The central issue at trial was identification, not the difference between using a gun and threatening to use a gun—after all, the carjacker shot two victims, and one died. The Wisconsin Supreme Court again denied review.

C. *State Habeas Corpus Proceedings*

Reynolds next filed a state habeas corpus petition in the Wisconsin Court of Appeals under *State v. Knight*, 484 N.W.2d 540 (Wis. 1992). In it, he alleged that Wisconsin violated his Sixth and Fourteenth Amendment right to counsel when the State Public Defender's Office stopped paying his appellate attorney. Reynolds claimed that the State interfered with his representation, created a conflict of interest between him and

his lawyer, and caused his lawyer to forgo investigating the equal protection challenge. The Court of Appeals once again denied relief. The court relied on two cases that applied the conflict-of-interest standard in *Cuyler v. Sullivan*, 446 U.S. 335 (1980)—*Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011), and *State v. Love*, 594 N.W.2d 806, 810–11 (Wis. 1999)—and found that Reynolds had not shown that the alleged conflict adversely affected his lawyer's representation of him. The court found as a matter of state law that Reynolds had forfeited the equal protection challenge by failing to raise it before the *Machner* evidentiary hearing. That means the forfeiture occurred *before* the State stopped paying his lawyer. Any effort to bring the equal protection claim after that point would have been frivolous, the Wisconsin Court of Appeals found, so the conflict of financial interest could not have adversely affected Williams's representation of Reynolds.

D.  *Federal Habeas Corpus Proceedings*

Reynolds then filed his federal habeas corpus petition under 28 U.S.C. § 2254. He argued that the State deprived him of counsel when it created a conflict of interest during his direct appeal, and that his appellate counsel was constitutionally ineffective for failing to object to the jury instructions.[2] The district court denied relief. The court found that there was sufficient evidence to convict Reynolds of either using force or threatening to use force, and thus any mistake in the jury instructions could not have prejudiced him. The court also found that Reynolds had not shown that a conflict adversely

---

[2] Reynolds raised several additional arguments about how his trial and appellate attorneys were ineffective, but he does not pursue those arguments in this appeal.

affected his appellate representation because Reynolds argued only that the conflict prevented his lawyer from pursuing a procedurally barred claim. The district court declined to grant a certificate of appealability, but we granted a certificate to review Reynolds's claims surrounding his representation after the State Public Defender's Office stopped paying his lawyer.

II. *Denial of Effective Counsel*

The Sixth and Fourteenth Amendments guarantee criminal defendants the effective assistance of counsel during their first appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 393–94, 396–97 (1985); *Douglas v. California*, 372 U.S. 353, 356–57 (1963). The two-prong analysis in *Strickland v. Washington*, 466 U.S. 668 (1984), governs most ineffective assistance claims. *Strickland* requires a petitioner to show: (1) that the attorney provided constitutionally deficient performance; and (2) that the deficient performance prejudiced the defense. *Id.* at 687. Prejudice under *Strickland* means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Although *Strickland* states the general rule, the Supreme Court has recognized some exceptions for situations in which prejudice is either presumed or easier to show. *Bell v. Cone*, 535 U.S. 685, 695–96 (2002) (explaining three circumstances when prejudice is presumed). Reynolds argues that two of these exceptions apply here: a complete denial of counsel and an actual conflict of interest.

A. *Complete Denial of Counsel*

Reynolds first argues that the State caused Williams to abandon his role as an advocate when it stopped paying him,

causing a complete denial of counsel under *United States v. Cronic*, 466 U.S. 648 (1984). *Cronic* recognized three "circumstances that are so likely to prejudice the accused" that they amount to a complete denial of counsel and prejudice is presumed. The first is when a defendant is denied the presence of counsel at a critical stage of the proceedings. The other two involve performance along those lines: counsel "entirely" failing "to subject the prosecution's case to meaningful adversarial testing," and circumstances that are likely to prevent any lawyer, "even a fully competent one," from providing effective assistance. *Id.* at 658–60; see also *Bell*, 535 U.S. at 695–97 (summarizing the three *Cronic* scenarios in which prejudice is presumed and emphasizing that counsel's failure "must be complete" to trigger presumption). Reynolds refers to the latter two situations as "constructive" denial of counsel and argues that one occurred here. He also likens his case to *Penson v. Ohio*, 488 U.S. 75 (1988), in which the Court found a complete denial of counsel when appellate counsel withdrew after submitting only a bare assertion that the appeal was meritless. *Id.* at 88–89.

The Wisconsin Court of Appeals did not reach this denial-of-counsel question, which leads Reynolds to argue that *de novo* review applies. But the Wisconsin court failed to reach this issue for a reason: Reynolds did not raise it in state court. He procedurally defaulted this claim, and we cannot consider it on the merits.

Before pursuing habeas relief in federal court, a state prisoner must exhaust available state-court remedies. 28 U.S.C. § 2254(b)(1). In addition, the federal claims "must be fairly presented to the state courts" so that the state has a "fair opportunity to consider" the issues "and to correct that asserted

constitutional defect." *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). Fair presentation generally requires the petitioner to raise both the operative facts and controlling legal principles in the state courts. *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001). If the petitioner fails to present a claim to the state courts, that claim is procedurally defaulted, and a federal habeas court cannot review it absent "cause and prejudice" or a miscarriage of justice (meaning conviction of an innocent person). E.g., *Thomas v. Williams*, 822 F.3d 378, 384, 386 (7th Cir. 2016), citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Even liberally construed, Reynolds's pro se petition to the Wisconsin Court of Appeals did not fairly present this claim for *denial* of counsel. He argued only that Wisconsin denied him the "effective assistance of counsel" by creating "an actual conflict of interest" between him and his counsel. The argument that he was denied counsel altogether is a different legal theory governed by a different legal rule—one that the Wisconsin courts did not have the chance to apply. By reformulating his claim in this appeal, Reynolds seeks to benefit from a less stringent standard for deciding prejudice: *Cronic*'s presumption of prejudice rather than *Sullivan*'s adverse-effect standard. This tactic does not work. See *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001) (reformulation "should not place the claim in a significantly different legal posture by making the claim stronger or more substantial"). A petitioner is not bound to his state court presentation word-for-word, and he may provide further support for his claim. But he still must have presented the governing legal principles and "the substance of a federal habeas corpus claim" to the state court. *Picard*, 404 U.S. at 278; see also *Duncan v. Henry*, 513 U.S. 364,

366 (1995) (per curiam) ("mere similarity of claims is insufficient to exhaust").

Even though Reynolds did not describe the issue in so many words as a complete denial of counsel, he might have fairly presented this claim if he had cited relevant cases and alleged facts that were "well within the mainstream of constitutional litigation" of that right. *Ellsworth*, 248 F.3d at 639. Reynolds did not do so. He did not rely on cases addressing complete denials of counsel. Instead, he cited *Strickland*, *Sullivan*, and *Walberg v. Israel*, 766 F.2d 1071 (7th Cir. 1985), a case applying the *Sullivan* conflict-of-interest standard. Reynolds also cited *Douglas v. California*, 372 U.S. 353 (1963), and *Evitts v. Lucey*, 469 U.S. 387 (1985)—two cases that established the right to effective assistance of counsel on direct appeal. But a single reference to these cases was insufficient, especially in light of the facts Reynolds described. Nowhere did Reynolds assert that his lawyer abandoned his case. Although he said that his lawyer "had in essence been fired," he also wrote that "Williams felt that it was his professional responsibility to complete the current briefing process" and that he petitioned the Wisconsin Supreme Court for further review as well. When describing his lawyer's deficient performance, Reynolds argued only that his lawyer declined to investigate one argument: the equal protection claim. Asserting that his lawyer failed to make that single argument did not fairly notify the state court that Reynolds claimed a complete denial of counsel. See *Penson*, 488 U.S. at 88–89 (distinguishing between failing "to press a particular argument" and being "entirely without the assistance of counsel on appeal").

The fair presentment rule is not so rigid that a pro se petitioner needed to cite *Cronic* or any other denial-of-counsel

case by name. For example, a petitioner could exhaust a denial of counsel claim by describing facts that amount to a complete denial of counsel and citing *Strickland*, which summarized: "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." 466 U.S. at 692. Still, the petitioner must describe facts and legal principles that fairly notify the court of what it should decide. Because Reynolds (1) did not rely on cases addressing the complete denial of counsel, (2) framed the violation as a conflict of interest under *Sullivan*, and (3) did not allege that he lacked an attorney, this abandonment claim was not fairly presented to the state courts. Moreover, even if the denial-of-counsel claim were not procedurally barred or if we were inclined to consider it as sufficiently related to the claims Reynolds did raise, the record makes clear that attorney Williams simply did not abandon Reynolds. Even after being told by the State Public Defender that he would not be paid any more for working on Reynolds's case, Williams continued to represent Reynolds for free in the state court of appeals, completing the briefing there, and then filing a petition for review with the Wisconsin Supreme Court. That fact does not immunize his work from scrutiny, but this was not an abandonment that could lead to the presumption of prejudice.

B.  *Conflict of Interest*

In the alternative, Reynolds argues that he was denied the effective assistance of counsel when the State Public Defender's Office created a conflict of interest by ceasing to pay his lawyer for work on Reynolds's case while also informing him that he would no longer receive new case assignments. Reynolds properly exhausted this claim, and the Wisconsin Court of Appeals decided it on the merits. We cannot issue a

writ of habeas corpus on this basis unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The first question under § 2254(d)(1) is the scope of clearly established federal law on a defendant's Sixth Amendment right to conflict-free counsel. The Supreme Court has held that concurrent multiple representation—for example, representing co-defendants in a single trial—violates the Sixth Amendment if it "gives rise to a conflict of interest." *Sullivan*, 446 U.S. at 348, citing *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978).

Reynolds argues that his lawyer's financial interest kept the lawyer from zealously representing him. We reject this argument for two independent reasons. First, the Supreme Court has not yet extended its multiple-representation decisions to financial conflicts of interest between attorney and client, let alone provided clear guidance as to whether or under what circumstances a financial conflict of interest between attorney and client violates a defendant's right to counsel. That silence presents a nearly insurmountable obstacle to this claim on a federal petition for a writ of habeas corpus. Second, the Supreme Court has not given lower courts much guidance as to what counts as an "adverse effect" under *Sullivan*, as distinct from a reasonable probability of a different outcome under *Strickland*. Without clearer guidance from the Supreme Court, the state court decision here was not contrary to or an unreasonable application of clearly established Supreme Court law.

In cases where defense counsel represents multiple clients with conflicting interests, the Supreme Court holds that the

standard for reversal depends on whether anyone objected to the conflict during the representation: "absent objection, a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'" *Mickens v. Taylor*, 535 U.S. 162, 168 (2002), quoting *Sullivan*, 446 U.S. at 349. If no party raises a timely objection to a conflict of interest arising from multiple representation, the accused must show that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348. If the defendant shows a conflict and a lapse in representation, prejudice is presumed. *Id.* at 349–50. Reynolds argues that the logic of *Sullivan* should apply to the financial pressure on his appellate lawyer, which caused the lawyer to decline to investigate the equal protection challenge and adversely affected his performance.

The Wisconsin Court of Appeals accepted *Sullivan* as stating the controlling federal rule. That court found that even if the State interfered with the lawyer's representation, that potential interference came *after* the lawyer had forfeited the equal protection claim. After the *Machner* evidentiary hearing, the scope of the appeal was limited by the lawyer's earlier filings, and the equal protection claim was no longer available.[3] The Wisconsin court then concluded that the financial conflict

---

[3] Reynolds argues that Wisconsin law did not actually limit the scope of the appeal at this point. The state courts treated the failure to raise the issue properly as a waiver. In habeas corpus litigation, federal courts ordinarily defer to state courts' applications of state procedural rules and doctrine to proceedings in state courts, at least as long as the relevant rules or doctrines are firmly established and consistently followed. E.g., *Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012). We see no reason to question the state courts' routine conclusion that Reynolds failed to raise the equal protection claim in a timely way.

had no adverse effect on Williams's representation. See *Sullivan*, 446 U.S. at 349–50. The state court reasoned that even if attorney Williams had investigated the equal protection theory, he should have concluded that the theory could not properly be presented to the court of appeals. It had been forfeited because it had not been raised in Reynolds's first appeal. Sep. App. 71–72.

The Wisconsin court's conclusion may or may not be correct in the end, but it did not unreasonably apply *Sullivan*. The Supreme Court itself simply has not extended *Sullivan*, or any constitutional analysis of conflicts of interest, to financial conflicts between attorney and client. *Sullivan* dealt with one team of lawyers who represented three men who were accused of the same murders but were tried in three separate trials. The Court vacated habeas relief for Sullivan, the one client who had been convicted. The Court held that, in the absence of a timely objection, the accused was required to show that the potential conflict of interest (a) had ripened into an actual conflict of interest that (b) adversely affected the adequacy of his lawyers' representation of him. 446 U.S. at 348.

The Supreme Court has not yet held that *Sullivan* extends even from multiple, conflicted *concurrent* representations to multiple, conflicted *successive* representations, *Mickens*, 535 U.S. at 174–76, let alone to financial conflicts of interest. *Mickens* affirmed the denial of habeas relief where the lawyer representing the accused in a murder case had been representing the murder victim on unrelated, undisclosed (and confidential) juvenile charges at the time he was murdered. The *Mickens* opinion noted that the case had been argued on the assumption that the *Sullivan* would extend to conflicted succes-

sive representations, but that the Court was not actually endorsing that assumption. *Id*. at 175. *Mickens* expressly left that successive representation question open. *Id*. at 176.

Under 28 U.S.C. § 2254(d)(1), the scope of the *Sullivan* rule is a critical issue here. *Mickens* acknowledged that the federal courts of appeals had applied *Sullivan* to "all kinds of alleged attorney ethical conflicts," including financial conflicts, as well as attorney's interests in getting a job with the prosecutor or romance with the prosecutor. 535 U.S. at 174. But *Mickens* pointedly did not endorse those extensions of *Sullivan*. *Id*. Cautioning the lower courts more broadly, the Court wrote that "Not all attorney conflicts present comparable difficulties." 535 U.S. at 175.[4]

This circuit has said that the "precise scope of claims to which the *Cuyler* [*v. Sullivan*] standard applies has not been definitively stated by the Supreme Court." *Spreitzer v. Peters*, 114 F.3d 1435, 1451 n.7 (7th Cir. 1997) (denying habeas relief). Since before *Mickens*, we have at least assumed that *Sullivan* extends to financial conflicts of interests. *United States v. Marrera*, 768 F.2d 201, 206–07 (7th Cir. 1985) (attorney and defendant agreed to share movie rights to story of crime). *Mickens* makes it very difficult, though, to take that step in a habeas corpus challenge to a state conviction governed by

---

[4] The cited financial conflict of interest case was *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980) (remanding for hearing on whether attorney F. Lee Bailey's book contract regarding the defense of Patty Hearst adversely affected his representation of her). But *Mickens* also noted the Fifth Circuit decision in *Beets v. Scott*, 65 F.3d 1258, 1269–72 (5th Cir. 1995) (en banc), which declined to extend *Sullivan* to a financial conflict of interest (also involving media contracts) and instead applied the *Strickland v. Washington* standard to the claim of ineffective assistance of counsel.

§ 2254(d)(1). To prevail here, Reynolds needs to show that it would be unreasonable for the state court to fail to extend *Sullivan* to financial conflicts between attorney and client and that the state court applied *Sullivan* unreasonably. That extension would be a significant new development, with effects far more sweeping than its extension from concurrent to successive representations. Extension to financial conflicts of interests would pose a range of challenging problems. It would not be unreasonable within the meaning of § 2254(d)(1) for lower courts to refrain from making that extension themselves.

A wide range of fee arrangements can create at least some tension between attorneys and clients. For example, it is not unusual in criminal defense for a lawyer to insist on a sizable up-front retainer against which the lawyer can bill, often with little hope of replenishing the retainer if the case takes more work than the lawyer initially expected. Nor is it unusual for clients to fall behind in paying their lawyers. In those and many other circumstances, lawyers may face more or less serious financial conflicts of interest as the client and case may call for additional work that will be essentially unpaid. Viewing the lawyer's incentives through a narrow and short-term economic lens, these situations give a lawyer a financial incentive to minimize non-essential work, much like attorney Williams's incentives here. Nor is it unusual for underpaid and overworked public defenders to have to allocate a finite number of hours in a month or year among different clients.

If such routine incentives, combined with an admission by a lawyer that his or her judgments about which additional work to carry out were affected at the margin by those incentives, were enough to find an actual conflict and "adverse effect" that demonstrated ineffective assistance of counsel,

many convictions would become vulnerable to collateral attack. Yet we know that lawyers facing such incentives and choices are also motivated by their sense of professional duty and pride, and an interest in their professional reputations, to continue to do good work for a client even if no more money will be paid in the particular case. Those realities underlie Rule of Professional Conduct 1.16. A client's failure to pay as agreed can provide good cause for a lawyer to terminate a representation. But Rule 1.16 provides that a lawyer in that situation must continue the representation if ordered to do so by a court. When that happens, there is a financial conflict of interest not unlike what has happened here. We have not been directed to any cases treating such conflicts as showing a denial of effective counsel, let alone to a controlling Supreme Court case holding as much.

These considerations help to show that how to apply conflict-of-interest doctrine, which so far has developed in the Supreme Court to address loyalties to multiple clients, to financial conflicts raises challenging questions that the Supreme Court simply has not addressed. Under § 2254(d)(1), we may not use a federal habeas proceeding to extend Supreme Court precedents into new fields where there is room for fair-minded disagreement, as there is here. See generally *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Still, Reynolds argues that a conflict of interest is a conflict of interest. From his point of view, the fact that the attorney's loyalties or interests ran in his personal favor rather than in favor of another client should not matter. After all, attorney Williams acknowledged that it was finances that led him to refuse Reynolds's request that he look into the equal protection challenge to the carjacking statute, and perhaps also to a

challenge to the jury instructions on carjacking. Reynolds relies on the language in *Sullivan* teaching, in the context of multiple, concurrent representations, that an actual conflict of interest that adversely affected the lawyer's performance violates the Sixth Amendment right to counsel. 446 U.S. at 348–49.

Assuming that the *Sullivan* standard applies to this financial conflict of interest, which would be consistent with both the state appellate court's approach here and our opinion in *Marrera*, Reynolds has shown *some* effect on Williams's representation: a failure to investigate at least the additional equal protection claim. An adverse effect seems to be a lower standard than the *Strickland* reasonable probability of a different result. But what does it take to show an adverse effect? The Wisconsin court concluded there was no adverse effect from the conflict of interest because any new claims or theories that Reynolds asked Williams to pursue, including the equal protection claim, were already forfeited by the time the conflict arose. Yet effective lawyers can sometimes overcome procedural hurdles in criminal appeals and habeas cases. And by asking whether Williams could have raised the equal protection claim after Reynolds asked him to, the *Sullivan* "adverse effect" standard begins to slide toward the *Strickland* standard of prejudice, gauged in terms of the outcome of the case. The *Sullivan* analysis seems to focus more on the conflict's effect on the attorney's actions than on the outcome of the case.

Yet *Sullivan* still requires not just an effect but an *adverse* effect on attorney performance. 446 U.S. at 348. The Supreme Court has not clarified what counts as an adverse effect. See *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) ("The

precise nature of [*Cuyler v. Sullivan*'s] 'actual conflict' and 'adverse effect' elements is rather vague … ."). Nor has the Court clarified where this standard lies between *any* effect on attorney performance and an effect that rises to *Strickland* prejudice.

We have written broadly that a defendant shows an adverse effect "if, but for the attorney's actual conflict of interest, there is 'a [reasonable] likelihood that counsel's performance somehow would have been different.'" *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994), quoting *Frazer v. United States*, 18 F.3d 778, 787 (9th Cir. 1994) (Beezer, J., concurring). We used that language in a most unusual case, and one that did not involve the forfeiture problem that the state court found decisive here. The lawyer in *Stoia* who had directed the defense strategy had entered his own plea agreement with the federal government. The lawyer was probably violating his plea agreement by directing the defense strategy in Stoia's case, and at the same time the lawyer was under investigation for soliciting perjury and obstructing justice in his representation of one of Stoia's co-defendants. 22 F.3d at 771–72. In *Stoia*, the defendant's other lawyers identified a number of specific ways in which the strategist made decisions that hurt Stoia's defense. *Id*. at 773.

That situation in *Stoia* is not readily comparable to a client's (or state public defender agency's) more quotidian refusal or inability to pay. And in any event, the broad *Stoia* language is not binding on state courts. Under § 2254(d)(1), we cannot grant habeas relief based on only our own precedent when a state court has ruled on the merits of a claim.

Even if our language in *Stoia* were binding precedent in this case, state courts interpreting it would still need to decide

what it means for counsel's performance to be "different," let alone "adverse." "Adverse" can be read fairly to require a showing of at least some sort of negative consequence for the client. It would not be unreasonable for a state court considering this question to peek at the merits of the claim that the attorney did not investigate and raise. Why would failure to raise a sure loser of an issue necessarily amount to an "adverse effect" requiring a new trial?

The Wisconsin carjacking statute does not rely on any distinctions that implicate suspect classes or fundamental rights. An equal protection challenge would have to show the legislature drew a line that bore no rational relationship to a legitimate governmental purpose, e.g., *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012), a standard that is very difficult to satisfy. This is not the sort of argument that moves courts to overlook procedural failures to free wrongly convicted defendants. The state court did not unreasonably apply Supreme Court precedent in holding that a missed opportunity to raise such an argument in an already untimely fashion was not an "adverse effect" within the meaning of *Sullivan*. Reynolds's claim cannot meet the stringent standard of § 2254(d)(1).[5]

---

[5] Our dissenting colleague proposes as a remedy that Reynolds's convictions be set aside. That remedy would not fit the argued violation of his right to counsel on appeal. If the financial conflict produced an "adverse effect" within the meaning of *Sullivan*, that effect was counsel's refusal to investigate an already-forfeited equal protection challenge to Wisconsin's carjacking statute. That potential challenge still has not been shown to have any arguable merit. If there were a constitutional violation here in the appellate representation, the remedy would seem to be a fresh appeal, not a new trial based on the assumption that the equal protection theory not only was not forfeited but would have produced a victory on appeal.

III. *Ineffective Assistance of Appellate Counsel*

Finally, Reynolds claims that he received ineffective assistance of appellate and trial counsel because both attorneys failed to challenge the jury instructions on his carjacking counts. This issue is outside the scope of the certificate of appealability. We certified Reynolds's claim that the State violated his right to the effective assistance of counsel "when the state public defender's office allegedly informed Reynolds's appointed counsel that he would not be paid for future work on Reynolds's case and when counsel, citing this reason, declined to conduct additional investigation that Reynolds requested." We did not certify any questions related to the jury instructions, and Reynolds did not request permission to argue any non-certified claims. See *Welch v. Hepp*, 793 F.3d 734, 737 (7th Cir. 2015). Also, since we know (a) that the state statute authorizes conviction for either use or threatened use of a weapon, see Wis. Stat. § 943.23(1g), and (b) that a deadly weapon was certainly used in this case, we see no reason to consider expanding the scope of our certificate of appealability. We therefore decline to review this issue. *Welch*, 793 F.3d at 737–38.

---

See, e.g., *Shaw v. Wilson*, 721 F.3d 908, 919 (7th Cir. 2013) (ordering new appeal where appellate counsel had been ineffective); see generally *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000) (where appellate counsel abandoned defendant by failing to file notice of appeal, and defendant otherwise would have taken appeal, defendant is entitled to new appeal); *Penson v. Ohio*, 488 U.S. 75, 87 (1988) (where state appellate court found several arguable issues in record, remedy for denial of counsel on appeal was new appeal); *Dodd v. Knight*, 533 F. Supp. 2d 844, 854 (N.D. Ind. 2008) (ordering new appeal where appellate counsel was ineffective).

The district court's judgment denying a writ of habeas corpus is

AFFIRMED.

WOOD, *Chief Judge*, dissenting. Few would doubt that financial conflicts of interest can destroy the integrity of a relationship. That is why, in *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court found that due process was violated when a local judge's salary depended on the fines that resulted from convictions in cases before him. See also *Connally v. Georgia*, 429 U.S. 245 (1977) (due process violated by local law providing that judge was compensated only when he issued search warrants, not when he denied them). It is why judges must give extra scrutiny to the performance of counsel in class actions, lest the lawyer sell out the class and walk away with an enormous fee. See RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 803–04 (9th ed. 2014); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 NW. U. L. REV. 469, 502–03 (1994). And it is why the Rules of Professional Conduct for Attorneys in Wisconsin, which are based on the American Bar Association's Model Rules with some additions not material here, state that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." SCR 20:1.7(a). One way in which a forbidden conflict can arise is if "there is a significant risk that the representation of one or more clients will be materially limited by … a personal interest of the lawyer." *Id.* at 20:1.7(a)(2). The lawyer is relieved of this responsibility only if, among other things, the "affected client gives informed consent, confirmed in a writing signed by the client." *Id.* at 20:1.7(b)(4). In addition, lawyers may not limit the scope of their representation of a client unless "the client gives informed consent," again in writing. *Id.* at 20:1.2(c).

The obvious concern is that, faced with a conflict between one's own financial interest and the interests of another person, the former will win out. If the lawyer puts his or her own

interest first, the client is the loser. This is precisely what Cornell Reynolds says happened to him in the course of the criminal prosecution the State of Wisconsin brought against him in the early 2000s.

The key events in the case can be summarized quickly. In May 2001, Reynolds was charged with carjacking resulting in death. The primary issue at the trial was identification. A jury convicted him, and he was sentenced in early 2002. As Wisconsin law permits, Reynolds then filed a direct appeal and a post-conviction motion simultaneously. At that point, the Wisconsin State Public Defender's Office appointed attorney Terry Williams to serve as Reynolds's post-conviction and appellate counsel. Williams filed a motion for a new trial on the ground that Reynolds's trial counsel had been ineffective in failing to raise an alibi defense. The state trial court denied the post-conviction motion without holding an evidentiary hearing.

Still with Williams's help, Reynolds appealed to the Wisconsin Court of Appeals, which reversed and remanded the ruling on the post-conviction motion so that the trial court could hold an evidentiary hearing on the ineffectiveness point. The trial court obliged, but it again concluded that Reynolds was not entitled to a new trial.

So far, so good. The problem now before us arose when Williams filed a new appeal on Reynolds's behalf. While that appeal was pending, someone on the staff of the Wisconsin State Public Defender's Office told Williams that he had spent too much time on the case. The consequences were serious for Williams: (1) he would not be paid for some of the work he already had done; (2) he would not be paid for any more work on Reynolds's case; and (3) he would no longer receive case

assignments from the Public Defender. At that point, Williams halted all further work on the case. Reynolds asked him to pursue an equal protection challenge to the car-jacking statute, but Williams refused to do so. Importantly, his stated reason had nothing to do with the potential merit of such an argument. Williams frankly said that he was shutting down his work because the state was not paying him. He told Reynolds that he would do additional work if Reynolds paid him for it, but Reynolds was unable to do so. Williams simply filed the brief he already had prepared, and after the court of appeals affirmed the trial court's order, he later filed a petition for review on Reynolds's behalf in the Wisconsin Supreme Court.

After some additional state proceedings, Reynolds filed a petition for habeas corpus under 28 U.S.C. § 2254 in the federal court. He presented several arguments: first, that he was constructively denied counsel after the Public Defender's Office cut off Williams's pay, in violation of *United States v. Cronic*, 466 U.S. 648 (1984); second, that Williams had an actual financial conflict of interest, which resulted in the denial of effective assistance of counsel under the standards of *Cuyler v. Sullivan*, 446 U.S. 335 (1980); and third, that his appellate counsel was ineffective pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to object to trial counsel's own failure to object to certain jury instructions. While I am persuaded that the state courts' decisions fell within the generous boundaries provided by section 2254 with respect to the first and third of these arguments, I conclude that the state courts, as well as the majority here, have failed to apply *Cuyler* properly and that Reynolds is entitled to issuance of the writ on this ground.

In *Cuyler*, the Supreme Court addressed the question "whether a state prisoner may obtain a federal writ of habeas corpus by showing that his retained defense counsel represented potentially conflicting interests." 446 U.S. at 337. In the case before the Court, two lawyers had represented three co-defendants in a murder prosecution. The Court accepted that this amounted to multiple representation. *Id.* at 342. But it clarified that "multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest." *Id.* at 348.

The burden on a defendant who seeks to establish a violation of the Sixth Amendment in such cases, the Court held, is to "demonstrate that an actual conflict of interest *adversely affected his lawyer's performance.*" *Id.* (emphasis added). Such a showing might rest on a failure to cross-examine a witness, or a failure to object to the introduction of certain evidence. *Id.* at 348–49. Critically, it is the lawyer's performance that is the focus of the inquiry, not the ultimate outcome of the trial. The Court expressly declared that once unconstitutional multiple representation has been demonstrated—that is, once the defendant has shown an actual conflict and an adverse effect on the lawyer's performance—there "is *never* harmless error." *Id.* at 349 (emphasis added). Underscoring that fact, the Court continued as follows:

> Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.

*Id.* at 349–50. Because the court of appeals had used a different standard, the Court remanded the case for further proceedings.

As my colleagues note, some conflicts and ethical viola-
tions do not present difficulties akin to multiple representa-
tion. *Ante* at 17. But we must not lose sight of the fact that
*Cuyler* created a standard to be applied not just when one at-
torney represents clients with competing interests, but "in sit-
uations where *Strickland* itself is evidently inadequate to as-
sure vindication of the defendant's Sixth Amendment right to
counsel." *Mickens v. Taylor*, 535 U.S. 162, 176 (2002). The exist-
ence of an actual conflict of interest between attorney and cli-
ent is one of those instances. *Cf. United States v. Gonzalez-Lopez*,
548 U.S. 140, 146 (2006) (finding structural error in the depri-
vation of the right to counsel of choice, rejecting harmless er-
ror, and holding that "no additional showing of prejudice is
required to make the violation 'complete'").

Reynolds has established the two elements required by
*Cuyler*: he has shown that there was an actual conflict of inter-
est between him and his lawyer, and he has shown that the
conflict had an adverse effect on his lawyer's performance, in-
sofar as the lawyer limited the scope of his representation to
the matters he already had researched and flatly refused to
look into anything else. The Supreme Court has not distin-
guished between an actual conflict of interest arising out of
multiple representation, as was present in *Cuyler*, and a more
direct conflict of interest between attorney and client based on
financial considerations. (Indeed, the latter situation involves
a form of multiple representation: Williams was trying to rep-
resent both himself and Reynolds.) Nor can there be any
doubt that the conflict between Reynolds and Williams af-
fected Williams's performance. Without obtaining Reynolds's
permission, as contemplated by professional ethics norms
and over Reynolds's direct objection, Williams froze his work
for Reynolds and did nothing but file what he already had

completed, following up on the same limited points with the state supreme court.

At the state post-conviction stage, Reynolds presented this conflict-of-interest claim to the state courts. The Wisconsin court of appeals agreed that "a conflict of interest may also arise when an attorney and his client have divergent interests." Sep. App. at 70 (quotation marks omitted). The court then correctly noted that the claimant had to show an actual conflict and an adverse effect on the lawyer's performance. *Id.* It then discussed Williams's performance for a bit, but it pivoted over to the ultimate result in the case, when it said that had Williams not had the conflict, he would have determined that the issue Reynolds wanted to raise was not properly before the court in any event. That is the language of harmless error, not a reference to Williams's own performance. It says, in essence, that the conflict affected Williams's performance insofar as he failed to raise the issues that Reynolds wanted to see explored, but that Williams's failure could not have affected the outcome.

That reasoning is contrary to the holding of *Cuyler*, which cannot have been more clear in rejecting a harmless-error approach. At the very least, it is an unreasonable application of *Cuyler*, since it shifts from a focus on Williams's performance to one on the ultimate impact of Williams's decisions in a manner that *Cuyler* forbids. See also *Mickens*, 535 U.S. at 170 (2002) (stressing that the conflict must affect counsel's performance, rather than be merely a theoretical division of loyalties). Tempting as it may be to engage in harmless-error analysis in every case, the Supreme Court has decided that there are some situations in which it is off the table.

The only remaining question is what the appropriate remedy is in this case. A common remedy for a failure of counsel at the appellate stage would be, as my colleagues have noted, a fresh appeal with unconflicted counsel. See *Shaw v. Wilson*, 721 F.3d 908, 919 (7th Cir. 2013). But nothing in the statute restricts the district court's options to only that remedy. To the contrary, the law provides that "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243, ¶ 8. The Supreme Court has recognized that "a court has broad discretion in conditioning a judgment granting habeas relief." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). The question here is thus what remedy would suffice to redress the serious miscarriage of justice suffered by Reynolds.

In my view, this is a situation that demands more than a fresh appeal. The state courts have already decided—in the absence of a proper adversary presentation on Reynolds's behalf—that any additional points that may have been raised on appeal were forfeited or meritless. I have no reason to believe that they would not simply reiterate that point, if we were to limit the remedy to a new appeal. (Principles of law-of-the-case might even require them to do so.) Because a new appeal would not redress the constitutional violation in Reynolds's case, I would issue a conditional writ granting him a new trial (if the state chooses to take that step). This is well within the scope of the statute, as our sister circuits have recognized. See, *e.g.*, *Ramchair v. Conway*, 601 F.3d 66, 78 (2d Cir. 2010) (petitioner deprived of effective appellate counsel entitled to new trial as remedy); *Turner v. Bagley*, 401 F.3d 718, 727 (6th Cir. 2005) (granting unconditional writ requiring new trial for deprivation of access to appellate process because of undue delay); *Eagle v. Linahan*, 279 F.3d 926, 943–44 (11th Cir. 2001)

(appellate counsel's failure to raise *Batson* claim remedied by grant of new trial).

In this respect, I agree with the observations of the Tenth Circuit in *Clayton v. Jones*, 700 F.3d 435 (10th Cir. 2012), a case in which the defendant was denied his right to appeal because of ineffective assistance of counsel. As that opinion put it, "[c]ertainly a district court is not confined to only granting an appeal out of time when a petitioner has been denied his right to a direct appeal. It is not unprecedented for a district court to fashion a remedy for ineffective assistance of counsel on appeal that goes beyond an appeal out of time." *Id.* at 443–44. The only problem in *Clayton* was that the district court had not sufficiently explained why a new appeal would not suffice. I have indicated why I believe this case is a proper candidate for a broader remedy. Reynolds has tried hard to navigate the habeas corpus process—no mean feat for even an experienced lawyer—and in my view he has shown that he should receive a new trial.

I therefore respectfully dissent.