[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-13599

————————————————

NICHOLAS BERNARD ACKLIN,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF CORREC-
TIONS,
WARDEN, HOLMAN CORRECTIONAL FACILITY,

Respondents-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:18-cv-00885-LSC

_____

Before WILSON, GRANT, and LUCK, Circuit Judges.

LUCK, Circuit Judge:

With the help of two accomplices, Nicholas Acklin held hostage seven friends gathered at a Huntsville, Alabama apartment: Ashley Rutherford, Michelle Hayden, Lamar Hemphill, Johnny Couch, Michael Beaudette, Brian Carter, and Mike Skirchak. After torturing and taunting them at gunpoint for two hours, Acklin shot and killed Mr. Hemphill, Mr. Couch, and Mr. Beaudette. He attempted to murder Mr. Rutherford and Ms. Hayden, too, shooting Mr. Rutherford in the head and Ms. Hayden in the head, arm, and abdomen. And one of Acklin's accomplices, following Acklin's lead in firing the first shot, fatally shot Mr. Carter.

Acklin was convicted and sentenced to death for the murders. He now appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. section 2254, claiming that, under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), a financial conflict of interest denied him his Sixth Amendment right to effective assistance of trial counsel. After careful review of the briefs and the record, and with the benefit of oral argument, we affirm.

# I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A.  The Murders

The night of September 25, 1996, started out as a quiet one at Mr. Rutherford's apartment, a 13' by 18' room in his elderly grandmother's house that was accessible through the garage. Mr. Rutherford's fiancée, Ms. Hayden, was at the apartment awaiting his return from work.  She was joined by Mr. Carter and Mr. Hemphill, and they passed the time watching television. Mr. Skirchak and Mr. Couch stopped by the apartment too, at around 10 P.M., because they were looking for Mr. Beaudette and saw his car parked out front.  But they decided to leave around 10:05 P.M., after seeing that Mr. Beaudette wasn't in the apartment.

As Mr. Skirchak and Mr. Couch tried to leave, they were confronted at the door by three armed men—Acklin, Joey Wilson, and Corey Johnson.  The gunmen had four firearms that they'd end up sharing with one another throughout the night.  A .357 magnum revolver.  A Ruger 9mm pistol.  And two Lorcin 9mm pistols.

With guns in hand, Acklin, Wilson, and Johnson forced Mr. Skirchak and Mr. Couch back into the apartment.  Ms. Hayden asked the three gunmen to leave, but they forced themselves inside the apartment anyway.  When they did, Johnson pushed Ms. Hayden into a chair by her throat, threatening that he'd shoot her if she didn't "keep [her] mouth shut."  As Mr. Beaudette entered the apartment minutes later, Acklin pushed him down, sat on top of

him, shoved the .357 magnum under his chin, and demanded everything in his pockets.

Acklin, Wilson, and Johnson started interrogating everyone in Mr. Rutherford's apartment about "who filled out the warrant." They were referring to the fact that, about a week earlier, the Huntsville Police Department questioned Wilson over a complaint that he and Johnson had stolen a cell phone from the same apartment. Acklin, Wilson, and Johnson wanted revenge against the person who made the complaint. But nobody in the apartment knew anything about a "warrant." So, not getting the answers that they wanted, Acklin, Wilson, and Johnson became more violent. They kicked, slapped, and spat on Mr. Beaudette, Mr. Carter, Mr. Hemphill, Mr. Skirchak, and Mr. Couch, over and over and over again. And Johnson beat Mr. Hemphill and Mr. Carter in the head with a Jack Daniels whiskey bottle.

In the midst of the chaos, Acklin took Ms. Hayden outside while armed with one of the guns, telling his accomplices that he would watch for Mr. Rutherford to show up. He started touching Ms. Hayden's breasts as she pleaded for him to "please stop." Instead of stopping, Acklin got frustrated and demanded that Ms. Hayden take off her pants. That's when Mr. Rutherford's car pulled up.

Acklin stuck the gun to Ms. Hayden's back and forced her inside, ordering her to sit by Mr. Beaudette. Meanwhile, Wilson and Johnson took care of Mr. Rutherford. Johnson lifted his shirt to threaten Mr. Rutherford with the .357 magnum, and Wilson put

Mr. Rutherford in a headlock to force him inside the apartment, slamming him into a loveseat.

Wilson and Acklin started beating, slapping, and spitting on Mr. Rutherford like they did with the others, asking "did [he] file the warrant." But they still weren't getting the answers that they wanted, so Acklin took the .357 magnum and shoved its barrel down Mr. Rutherford's throat until he gagged. Wilson turned his attention to Mr. Couch, grabbing him by the ponytail, slamming his head into a dresser, stomping on his head and chest until he was almost unconscious, and cutting off his ponytail with scissors. Wilson also put his gun on a table and dared the victims "to go ahead and grab it" if they "were bad enough to grab it." And Acklin, Wilson, and Johnson had all of the men take their shoes and pants off to sit with their underwear exposed.

Acklin turned his attention back to Ms. Hayden. When he went outside to steal a stereo from Mr. Carter's car, he demanded that Ms. Hayden go with him. He told her that she had "[o]ne more chance for [her] to drop [her] pants" or, if she didn't, to "take [her] chances." Ms. Hayden refused and went back inside after Acklin took the stereo and a knife from Mr. Carter's car. Acklin then followed her back inside, lying to Mr. Rutherford that Ms. Hayden—his fiancée—had just performed oral sex on him. Acklin also threw Mr. Carter's knife at him, hitting Mr. Carter's leg before falling on the floor, and proclaimed to Wilson, "look, he has a knife!"

As midnight neared, still without the answers they wanted about who filled out the "warrant," Acklin and Wilson started rounding up the victims' driver's licenses, money, and whatever else they had in their pockets. Acklin and Wilson were getting more aggressive. As Johnson tried to calm them down, the three gunmen started getting frustrated with one another, yelling back and forth that one of them needed to go start their car outside. That task ended up falling to Acklin, so he went outside to start the car while Wilson stayed inside pointing his gun in Mr. Rutherford's face, threatening "you better answer me now, Ashley, if you want to live throughout the night."

When Acklin came back inside from starting the car, he was carrying the two Lorcins—one in his hand, one in his waistband. Wilson was still interrogating Mr. Rutherford. But Acklin decided that he had heard enough. Proclaiming "f-ck it," he raised one of the Lorcins to the back of Mr. Rutherford's head. Then he pulled the trigger.

Mr. Skirchak escaped out the apartment's back door. But, undeterred, Acklin proceeded to methodically shoot the others, one by one, in front of each other. Acklin shot Mr. Hemphill in the head. He shot Mr. Couch twice in the head. He shot Mr. Beaudette once in the head and once in the upper leg. He shot Ms. Hayden in the head, arm, and abdomen. And before Acklin could shoot Mr. Carter too, Wilson shot Mr. Carter six times in the neck and chest. Having gotten their revenge, Acklin, Wilson, and Johnson fled the apartment.

In a pool of his own blood, Mr. Rutherford pretended he was dead until the gunmen left. Ms. Hayden laid on the floor nearby and she, clinging to life, had a shattered elbow and jaw. Mr. Rutherford was trying to stop her bleeding when his elderly aunt, who shared the house, showed up. With his aunt's help, Mr. Rutherford called 911. First responders arrived around 12:20 A.M. to find Mr. Rutherford trying to save his fiancée, Mr. Beaudette, Mr. Carter, and Mr. Couch already dead, and Mr. Hemphill barely alive. Mr. Hemphill was taken away in an ambulance but did not survive.

Panic stricken, Mr. Rutherford could only give officers Wilson's name as the person responsible for the carnage. Officers acted quickly by putting out a be-on-the-lookout alert for Wilson, and they found him driving his car—with Johnson—around 12:25 A.M. The .357 magnum was under Johnson's seat.

Mr. Skirchak gave the officers Acklin's name after finding help and returning to the apartment. Officers went to Acklin's home just before 2:00 A.M. and arrested him. During a search of the home, they found the two Lorcins, the Ruger, and Mr. Beaudette's driver's license.

An Alabama grand jury indicted Acklin after his arrest, charging him with capital murder of two or more persons (Mr. Hemphill, Mr. Beaudette, Mr. Couch, and Mr. Carter), in violation of Alabama Code section 13A-5-40(a)(10). The indictment also charged Acklin with the attempted murders of Mr. Rutherford and Ms. Hayden, in violation of section 13A-4-2.

### B.  The Lead-Up to Trial

#### 1.  Trial Counsel's Preparation and Compensation

On September 30, 1996, four days after Acklin's arrest, his parents—Velma Acklin Evans and Theodis "Ted" Acklin—met with attorney Behrouz Rahmati about representing their son.[1] Mr. Rahmati agreed to represent Acklin.

To make it official, Ms. Evans, but not Ted, signed Mr. Rahmati's retainer agreement.  The retainer agreement provided that Ms. Evans would pay a $25,000 retainer fee—due in full before Mr. Rahmati completed any work on the case—that Mr. Rahmati could bill against to pay his $150 hourly fee.  If Mr. Rahmati's hourly fees ended up exceeding the retainer, Ms. Evans agreed to pay the excess, too.  And Ms. Evans agreed to pay the costs of representation as they were incurred, including court filing and transcript fees.

Despite the terms of the retainer agreement, Ms. Evans didn't pay Mr. Rahmati anything during the September 30 meeting because she didn't have the money.  Ted didn't pay Mr. Rahmati anything, either.  Nevertheless, Mr. Rahmati hit the ground running on Acklin's case the very next day by drafting motions for discovery and a preliminary hearing.  He was assisted by Kevin Gray,

---

[1] Because they share the same last name, we refer to Acklin's father as Ted and Acklin's brother, Steve Acklin, as Steve.

a two-year attorney who had worked with Mr. Rahmati before and joined Acklin's defense as co-counsel.

Together, Mr. Rahmati and Mr. Gray represented Acklin over the next two years, through his October 19, 1998, trial. They attended every court hearing over these two years. They also researched case law and submitted a variety of motions aimed at aiding Acklin's trial chances or avoiding a trial altogether—including discovery motions, motions to suppress evidence, motions regarding jury selection, a motion to exclude the victims' autopsy photos, motions to dismiss the indictment, and a motion for change of venue. To support the venue motion, trial counsel subpoenaed local media outlets for records that could show how pretrial publicity affected the case.

Besides this motion practice, trial counsel investigated evidentiary leads for trial and the penalty phase. Early on in their investigation, for example, trial counsel sought a mental health examination of Acklin that could shed light on his competency to stand trial and his mental state during the murders. Dr. Lawrence Maier, a psychologist and forensic examiner, evaluated Acklin on March 14, 1997. He summarized his findings in a report, explaining that Acklin had been abusing marijuana and alcohol for years before the murders. This substance abuse "was heavy prior to and up to the time of the crimes." But, Dr. Maier concluded, Acklin was competent and his ability to conform his conduct to the law on the night of the murders was not "significantly impaired" by the substance abuse. Mr. Rahmati reviewed the report and spoke with

Dr. Maier about his findings before determining they wouldn't aid Acklin's defense.

Dr. Maier wasn't the only doctor Mr. Rahmati consulted. Because Ms. Evans told Mr. Rahmati that Acklin was diabetic, he requested Acklin's medical records and consulted a potential expert witness, Dr. Taylor Noggle. Hoping to use the evidence of Acklin's diabetes to show he lacked the intent to murder or as mitigation, Mr. Rahmati asked Dr. Noggle about the combined effect of the diabetes and substance abuse on Acklin's mental state during the murders. Mr. Rahmati ultimately determined Dr. Noggle's opinion wouldn't be helpful for trial or the penalty phase.

In addition to Acklin's substance abuse and diabetes, there were other evidentiary leads trial counsel honed in on. Trial counsel reviewed the state's discovery and subpoenaed the state's witnesses. They separately reviewed the evidence presented at Wilson's trial, which Mr. Gray had attended. And they conferred with Acklin and his parents many times about character witnesses that could be called during the penalty phase. Trial counsel interviewed these witnesses either at their office or over the phone.

Over these two years of motion practice and preparing for Acklin's trial, neither Ms. Evans nor Ted paid trial counsel's full retainer or anything close to it. Ms. Evans made her first and largest payment to trial counsel—$500—on October 25, 1996. She followed it up with twelve smaller payments: A $200 payment on November 21, 1996. A $200 payment on February 14, 1997. A $150 payment on March 14, 1997, and another $150 on April 24, 1997. A

$100 payment on August 1, 1997. A $125 payment on October 9, 1997. A $100 payment on December 8, 1997. A $125 payment on January 21, 1998. Another $100 on March 2, 1998, and May 22, 1998. A $125 payment on July 15, 1998. And, as her last payment, $150 on September 11, 1998.

Ted, for his part, paid trial counsel three times across the two years they worked on Acklin's case. He paid $700 on March 17, 1998, $2,000 on September 28, 1998, and $200 on October 5, 1998.

In all, Ms. Evans's and Ted's payments totaled $5,025, about a fifth of the $25,000 retainer. Because trial counsel's time spent working on the case exceeded what the retainer contemplated, more than $50,000 in unpaid fees and costs were still owed by October 17, 1998—two days before Acklin's trial.

### 2. Ms. Evans's Domestic Abuse Allegations

Two days before trial, on October 17, Mr. Rahmati met again with Ms. Evans to discuss the case. At the meeting, Ms. Evans told Mr. Rahmati—for the first time—that before she and Ted divorced, when Acklin was eleven or twelve years old, Ted was physically and verbally abusive to her, Acklin, and his brothers. Specifically, Ms. Evans told Mr. Rahmati that "there was lots of fights" in the household, Ted once pushed Ms. Evans out of a first- or second-story window, and about how, "if [Ted] was mad at the kids, he would hold them down, put a gun to them, threaten to shoot them, [and] threaten to kill them."

After the meeting with Ms. Evans, Mr. Rahmati met with Ted to confirm if the allegations were true and, if they were, to ask him to testify about the abuse.  Ted was outraged by the allegations and denied that he ever abused his family.  Mr. Rahmati pleaded with Ted, "Look, this is critical.  You can help your son, possibly, possibly.  We've got a stacked deck against us as it is."

Rejecting Mr. Rahmati's plea, Ted got up and responded, "'I can't believe they are doing this,' or '[t]hey are going there,' something to that effect."  "You tell Nick if he wants to go down this road, I'm done with him" and "done helping with this case," Ted continued.  Ted then stormed out of Mr. Rahmati's office as Mr. Rahmati promised, "[Ted], I will do whatever I need to, to get you to this sentencing phase; I just want you to know that."

After Ted left Mr. Rahmati's office, Mr. Rahmati visited Acklin to ask if the abuse allegations were true.  Mr. Rahmati told Acklin everything that Ms. Evans alleged and everything that Ted said when confronted about the allegations.  Unlike Ted, Acklin confirmed Ms. Evans was telling the truth and that Ted was an abusive father.  Mr. Rahmati explained to Acklin that the domestic abuse evidence was "important" because a jury might find it mitigating and he'd need to present it, even if that meant compelling Ted to testify.  But Acklin wouldn't permit Mr. Rahmati to subpoena Ted or present evidence about the abuse.  Mr. Rahmati insisted, but he couldn't get Acklin to change his mind.  "That didn't cause me to be here.  I don't want to ruin their lives or have anything like this to come out on them," Acklin told Mr. Rahmati.

Mr. Rahmati asked Acklin to sign a written acknowledgment that he refused to allow Mr. Rahmati to introduce the domestic abuse evidence.   The acknowledgment memorialized that Mr. Rahmati advised Acklin that the domestic abuse evidence could help his case as mitigating evidence and that Mr. Rahmati was prepared to offer it, but Acklin refused:

> I, Nicholas Bernard Acklin, hereby acknowledge that my attorneys, Behrouz K. Rahmati and Kevin C. Gray, have consulted with me and advised me regarding certain potentially mitigating evidence, which they are prepared to offer on my behalf.  This mitigating evidence consists of testimony from my mother and possibly other siblings and family members that I suffered some degree of abusive behavior during my formative years at the hands of my father. . . .  My above-mentioned attorneys have advised me that this evidence could possibly be considered by a jury in mitigation . . . .  I have expressly forbidden them to mention or present such evidence or argue such evidence during any part of the trial proceeding, including either the guilt or penalty phase.

Acklin signed the acknowledgment.

## C.  Trial and Sentence

Trial began two days later with jury selection.  After hearing two days of testimony, the jury found Acklin guilty of capital murder (of Mr. Hemphill, Mr. Beaudette, Mr. Couch, and Mr. Carter) and attempted murder (of Mr. Rutherford and Ms. Hayden).

1.  The Penalty Phase

Then the penalty phase started.  The state offered testimony from family members of the four deceased victims:  Larry Hemphill, who told the jury "nobody deserve[d] to die" like his son, Lamar; Nancy DeMichele, who described how losing her son, Mr. Couch, "devastated" and "buried" her; Clyde Carter, who testified that he couldn't sleep because he'd wait for his son, Brian, to walk in the house at night; and Nomi Donalson, who said that she cried every night at the loss of her son, Mr. Beaudette.

Trial counsel presented eight witnesses to testify for Acklin. The first four were members of the community who knew Acklin: Walter Rice, who was a security officer at Acklin's former employer, told the jury that Acklin had a "nice personality" and got along with his coworkers; Alphonso Holden, who worked for a local ministry and knew Acklin for about fifteen years, testified that he never knew Acklin to be violent and that "he ha[d] shown a lot of remorse" for his crimes; Robert Rogers, a pastor who knew Acklin "all of his life," said that he was surprised by Acklin's crimes, prayed for everyone involved, and "plead[ed] for mercy"; and McKinnley Jones, another pastor who also knew Acklin "[a]ll of his life," testified that he was also surprised by Acklin's crimes because he knew Acklin to be nonviolent.

The next four witnesses were Acklin's family members.  The first was Acklin's aunt, Jo Anne Belt, who told the jury that the murders were "[o]ut of character" for Acklin because he was "peaceful."

Ms. Belt was followed by Ted. Ted testified that he was preaching in Mobile when Ms. Evans called him about Acklin's arrest. Ms. Evans's news made him "not only . . . traumatized for [Acklin] and [the] family, but as a minister [he] was traumatized for the family members of the deceased." When Acklin was growing up, Ted explained, he was a "typical" but "quiet" teenager; "[h]e didn't give [his parents] any problems, easily disciplined." But Acklin "was never disrespectful to anyone," so Ted and Ms. Evans "didn't have that problem." During Acklin's childhood, Ted was "an overly protective parent" who just "wanted to be a good father" and "to protect [his] children."

Speaking directly to the victims' families, Ted assured them that he was "sorry" because he "love[d his] child and [he] kn[e]w [they] love[d their] children," too. He had been praying for the families—he "ask[ed] G-d to help [them] to forgive [his] son" just like he "had to forgive" his son. Ted wondered "where did [he] go wrong" as a parent because Acklin "was raised in a G-d-fearing home," he tried to maintain the close father-son relationship that his father denied him, and he regularly took Acklin to church. For example, about a week before the murders, Ted took Acklin and Acklin's children to the church he pastored, encouraging them to visit more often. Acklin hadn't attended the church for "maybe a year" and that concerned Ted. As for how often Ted saw Acklin after the murders, Ted would visit Acklin at the prison "every other Sunday" "if not every Sunday." Ted also spoke with Acklin "every week," and Acklin would write to Ted about how he "strayed from [Ted's] teaching."

To wrap up his testimony, Ted acknowledged that the case was "difficult" for the jury but he "pray[ed]" they would "have mercy," that they would "empathize with [him] as a parent." Unlike the victims' families who "didn't have a chance to plead for their children['s] lives," Ted continued, he had the opportunity and was "on the stand . . . pleading for [his] son's life."

Finally, Acklin called Louise Vance (his grandmother) and Ms. Evans, who both told the jury that they couldn't believe what Acklin had done, they prayed for the victims' families, and they thought Acklin should receive a life sentence.

After deliberating, by a vote of ten to two, the jury recommended that Acklin be sentenced to death.

## 2. The Sentence

About two weeks after receiving the jury's recommendation, the state trial court held a sentencing hearing. The state did not have any additional testimony to present. But Mr. Rahmati told the state trial court that Ted "ha[d] something that he would like to tell the [c]ourt." Mr. Rahmati clarified that Ted's statement was "not going to be testimony" and that he was "not going to ask [Ted] questions."

Ted stood up and "plead[ed] for [his] son's life" like he did before the jury. Ted emphasized that Acklin "was raised in a Christian home, Protestant ethics, hard work, good values, to love and respect others." But, Ted explained, "[s]omehow [Acklin] slipped" from "the teachings that his mother and [Ted] had instilled in him."

Citing his experience as a pastor, Ted "fe[lt] like G-d ha[d] forgiven [Acklin]" and that Acklin "felt remorse."

With all of the evidence presented, the state trial court imposed Acklin's sentence. The state trial court found that the state had proven two aggravating factors—(1) Acklin knowingly created a great risk of death to many persons, *see* Ala. Code § 13A-5-49(3), and (2) the murders were especially heinous, atrocious, or cruel compared to other capital offenses, *see id.* § 13A-5-49(8)—beyond a reasonable doubt. Acklin caused a great risk of death to many persons, the state trial court explained, because he was "the 'triggerman' of three of the deceased victims," shot Mr. Rutherford in the head, and shot Ms. Hayden "three times, resulting in an extremely serious injury." Acklin's accomplice, Wilson, "shot [Mr.] Carter six times in the neck and chest." Overall, nineteen shots were fired "inside [a] small room," and "Acklin actually shot five of the six people who were either killed or wounded."

The murders were especially heinous, atrocious, or cruel, the state trial court found, because Acklin tortured the victims before shooting five of them, one by one, in an "execution-style slaying" that was "cold," "calculated," and "methodical[]." "Prior to the discharge of the two weapons," Acklin and his accomplices "subjected [the victims] to threats and intimidation." They held the victims captive "at gun point," "required [the victims] to remove various portions of their clothing (primarily their pants)," "kicked and stomped [Mr.] Couch until he was almost unconscious" before "cut[ting] off his pony tail with a pair of scissors,"

and "repeatedly" beat and spat on the victims. During all of this, the state trial court continued, Acklin sexually assaulted Ms. Hayden and taunted Mr. Rutherford about her performing oral sex although "[s]he did not." Acklin also stole the victims' belongings and shoved the .357 magnum in Mr. Rutherford's mouth and under Mr. Beaudette's chin.

The state trial court then turned to the mitigating circumstances. It found that Acklin established one statutory mitigating circumstance—he had no significant history of prior criminal activity, *id.* § 13A-5-51(1)—and he had proven three non-statutory mitigating circumstances: (1) Acklin was a quiet and polite person during his formative years without a history of assaultive behavior; (2) Acklin was in a committed relationship and had two children; and (3) Acklin attended church and participated in church activities when he was younger.

The state trial court rejected two other non-statutory mitigating circumstances proffered by Acklin—his remorse and that he was raised in a good home. The state trial court found that Acklin "[wa]s clearly not remorseful" and Acklin being raised in a good home was not mitigating. "Most killers," the state trial court explained, "are typically the products of poverty, a dysfunctional family, physical or sexual abuse[, or] social deprivation." But, "impressed with the sincerity of the testimony by [Acklin's] mother and father," the state trial court found that Ms. Evans and Ted "[we]re clearly good people and tried to do the right thing in raising

[Acklin]." After being raised in this "loving middle-class family," Acklin "made a conscious choice to become a killer."

Weighing the aggravating factors against the mitigating circumstances, and considering the jury's recommendation, the state trial court found that the two aggravating factors "substantially outweigh[ed]" the mitigating circumstances. The state trial court also found, although "not required by law to make this second analysis, . . . each of the two aggravating circumstances, even standing alone, outweigh[ed] all the mitigating circumstances." Thus, the state trial court sentenced Acklin to death.

Mr. Rahmati and Mr. Gray withdrew as counsel after the sentencing hearing. Their final billing to Ms. Evans totaled more than $75,000.

Acklin appealed his convictions and sentence with new counsel, but the state appellate court affirmed. *Acklin v. State*, 790 So. 2d 975, 982 (Ala. Crim. App. 2000). Both the Alabama Supreme Court and the United States Supreme Court denied his petitions for a writ of certiorari. *Ex parte Acklin*, 790 So. 2d 1012 (Ala. 2001); *Acklin v. Alabama*, 533 U.S. 936 (2001).

### D. State Habeas Proceedings

With his direct appeal exhausted, Acklin moved for postconviction relief under Alabama Rule of Criminal Procedure 32. He alleged that he was denied effective assistance of trial counsel, in violation of the Sixth Amendment, because his trial counsel had a financial conflict of interest. Acknowledging he had to show the conflict resulted in prejudice to obtain relief, Acklin asserted that

*Sullivan*'s presumed prejudice rule applied to his claim. Where *Sullivan* applies, prejudice is presumed if the petitioner shows (1) "an actual conflict of interest" (2) that "adversely affected his lawyer[s'] performance." 446 U.S. at 350. Acklin maintained that prejudice should be presumed under *Sullivan* because his trial counsel had an actual, financial conflict once Ted, who "provided the[ir] primary financial support," "threatened to withdraw [it] if evidence of [the domestic] abuse was introduced at trial." And, he added, the conflict had an adverse effect because trial counsel chose not to present the domestic abuse evidence after Ted threatened to stop paying them.

### 1. The Evidentiary Hearing

The rule 32 court held an evidentiary hearing on Acklin's motion for postconviction relief. In support of his *Sullivan*-based financial-conflict-of-interest claim, Acklin presented testimony from Mr. Rahmati, Mr. Gray, Ms. Evans, and one of his brothers, Steve.

### a. Mr. Rahmati

Mr. Rahmati testified about the "many fronts" he and Mr. Gray "focus[ed] on" when investigating evidence for the guilt and penalty phases, including Acklin's history of substance abuse and his diabetes. Mr. Rahmati knew soon after taking the case that, "due to the facts of th[e] case, . . . there was a high probability" of a penalty phase. The high probability of a penalty phase was why he and Mr. Gray "looked at any and all mitigation avenues that [they] had" throughout their investigation. For example, "from the

very beginning" of the case, Mr. Rahmati asked Acklin and his parents for the contact information of character witnesses who could speak to Acklin's "good character, demeanor[, and] all positive events that [they] could possibly get in as evidence." "[He] would have asked [Acklin], [he] would have asked [Acklin's] mom, [he] would have asked [Acklin's] father." The witnesses that testified during the penalty phase were the ones that the family told trial counsel to look into.

As part of this investigation, Mr. Rahmati had "absolutely" asked Acklin and Ms. Evans whether there had been abuse in the family. Mr. Rahmati was only told about "minor spats," "[n]othing to the extent that was disclosed to [Mr. Rahmati] by Ms. Evans" two days before the trial. That's why Mr. Rahmati was "very surprised" when Ms. Evans finally told him about Ted's abuse; the family had "never disclosed those details to [Mr. Rahmati or Mr. Gray] even though [they] had discussed [it], with the whole family that [they] could talk to, with the exception of [Acklin's] brothers" who were incarcerated. But, although surprised by Ms. Evans's allegations, "all [Mr. Rahmati] wanted[] was the truth, so [he] could figure out how to truly help [his] client." He wasn't sure "[h]ow much impact" the domestic abuse evidence would've had when he approached Ted and Acklin, but Mr. Rahmati "felt certainly that [he] would need to try to introduce it." And because he "felt so strong about the need to try to introduce [the domestic abuse] evidence," he "felt the need" to memorialize Acklin's instruction not to present the evidence in the written acknowledgment.

Overall, Mr. Rahmati thought that he and Mr. Gray "did everything [they] absolutely, positively could do, and then some," when preparing for Acklin's trial because he "gave [his] word" to Ms. Evans that he would. It was Mr. Rahmati's understanding that Ms. Evans would be legally responsible for paying the fees and costs of the representation because Ted did not sign the retainer agreement. But Mr. Rahmati "knew that the family was having a hard time financially, or Ms. Evans specifically." Her financial distress "was obvious from Day 1," and Mr. Rahmati "suspected strongly" that he and Mr. Gray "were never going to get paid from Day 1."

Once Ms. Evans started paying trial counsel, Mr. Rahmati viewed the money as "[n]ot really" a lot for work on a capital murder case. Still, Mr. Rahmati "respect[ed] Ms. Evans for at least trying" to contribute to her son's defense, even though her contributions averaged only $100 or $200 a month. That the payments averaged "$100- or $200-a-month" was "a very strong signal" that the family did not "have the means to pay for attorney's fees."

Ms. Evans's hard time paying for the representation was why Mr. Rahmati approached Ted in March 1998 about pitching in. Mr. Rahmati wasn't sure that Ted was "really trying as hard as Ms. Evans" and "assumed, as any parent, that [Ted] would contribute as a father." But, "[a]t that point" in March 1998, the money "wasn't important to [Mr. Rahmati]."

Mr. Rahmati acknowledged that, on June 1, 1998, he requested that the state trial court appoint him to the case because

Acklin was indigent. If appointed to the case, he would've made statutory fees of $40 an hour for in-court services and $20 an hour for out-of-court services, subject to a $1,000 cap for the guilt phase and a $1,000 cap for the penalty phase. That could've meant making more money for "three hours in court" ($120) than what Ms. Evans and Ted were, on average, "paying in a month."

But Mr. Rahmati withdrew his request for court-appointment four days later. Mr. Gray didn't have enough experience to be appointed to capital cases, and both Mr. Rahmati and Acklin wanted Mr. Gray to stay on the case. Although Mr. Rahmati "obviously knew" the statutory fees would've helped because "the family could not financially afford paying [his hourly] fee," he reemphasized that, "at that point[,] it wasn't necessarily about the money anymore." "If you see somebody trying," Mr. Rahmati testified, "that's all you can ask for; and Ms. Evans . . . seemed to be trying, even though it was $100 a month."

### b. *Mr. Gray*

Mr. Gray explained that he was essentially Mr. Rahmati's "first-year associate." He didn't take the lead on defense strategy. Instead, he "would handle a lot of the research[ and] a lot of the initial drafting" of motions, which Mr. Rahmati would review and revise. Mr. Gray would also join Mr. Rahmati to interview witnesses or talk to the prosecutors, "mainly taking notes."

Mr. Gray "remember[ed], in getting ready for trial," how he and Mr. Rahmati "met with numerous of the witnesses in [their] office." They also met with Acklin "[m]any times" before trial and

talked "extensively" with him.  During these meetings, trial counsel would advise Acklin, "Tell us everything you possibly can"—trying to "get[] as much information about his background, his history, who he was."

Mr. Gray couldn't speak in detail about whether Ms. Evans was keeping up with her payments as required by the retainer agreement, but he did recall "receiv[ing] very little in terms of payments."

### c.  Ms. Evans

When Ms. Evans testified at the rule 32 hearing, she acknowledged that trial counsel asked her and Ted for the names of character witnesses to contact.  She didn't remember Mr. Rahmati asking about abuse in the family or Acklin's childhood, but she admitted he could've asked.  She also admitted that she didn't bring up Ted's abuse until "right before [the] trial."

Besides the examples of Ted's abuse she gave Mr. Rahmati, Ms. Evans described how, one night when she was pregnant with Acklin, she and Ted got in an argument before Ted chased her out of the house.  Ted continued chasing Ms. Evans in his car before she fell, and he brought her back home instead of to the emergency room.  Another time, when Acklin was a young child, Ms. Evans and Acklin were in a car with Ted when he shoved Ms. Evans's head into the gear shift, bruising her face.  When the family got home, Ted pushed Ms. Evans into a closet.

Ted was particularly abusive in the lead-up to the couple's divorce.  That was when "things [had] changed" because Ms. Evans

confessed to Ted that she was having an affair. "[F]rom that time on, when [Ted] would come home from work[] and [Ms. Evans] and the boys would be at the house, he would just come in . . . and jump[] right in on [her]," threatening to kill her. Acklin and his brothers would "scream[]" for their father to stop.

Ms. Evans finally left Ted "for good" after another time where he chased her out of the house, as "[t]he boys" were "standing in the yard . . . and they were crying." Ted was given primary custody of the kids after the divorce.

All of this, as Ms. Evans perceived it, changed Acklin from a happy child into an angry one. But she added that Ted's abuse didn't stop Acklin from growing up to graduate high school, maintain employment, and have a committed relationship and two children of his own. And although Ms. Evans regularly took Acklin and his brothers to church before her divorce with Ted, Ted took the kids to the church he pastored after the divorce, where Acklin participated in the youth choir. It was "possible" that Ted abused the kids after the divorce, but Ted mostly directed his abuse "toward [Ms. Evans]." There was one incident after the divorce when Acklin locked himself in a bathroom because Ted was threatening him with a gun.

### d.  Steve Acklin

Steve provided more details about how Ted abused his sons by beating them and threatening them with a gun. Like Ms. Evans, Steve added that Acklin "always had a job" when they were growing up; for example, Acklin worked at a supermarket before

26                    Opinion of the Court                    22-13599

graduating high school.  But Ted's past abuse still affected Steve "[a] little bit" although he grew up to own and run a business. Steve had talked to trial counsel "during th[e] trial period" but could not remember what they discussed.

### e.   Other Evidence

Besides the witness testimony, Acklin introduced four categories of documents at the rule 32 hearing:   (1) letters from Mr. Rahmati to Acklin's parents about money owed under the retainer agreement; (2) letters between Mr. Rahmati and Acklin and Ms. Evans about trial preparation; (3) Ms. Evans's medical records; and (4) trial counsel's billing statement.

In the first category—the letters from Mr. Rahmati to Acklin's parents about money owed under the retainer agreement— there were a total of twenty-one letters.  Mr. Rahmati sent Ms. Evans and Ted eight letters between December 15, 1997, and October 15, 1998, thanking them for particular payments.  Six additional letters from Mr. Rahmati, which predated Acklin's trial, informed Ms. Evans of the more than $20,000 due on the retainer.  And Mr. Rahmati sent Ted seven letters, dated after Acklin's trial, informing him of the balance due and asking him to set up a payment plan.

The second category were letters updating Acklin and his mother about case developments and asking them to assist with trial preparation.  For example, in a November 6, 1997, letter, Mr. Rahmati updated Acklin on Wilson's case, explained that he was reviewing the "extensive" discovery in Acklin's case so that

they could discuss the "most important" items, noted that he was preparing motions, and stressed that he needed to speak with Ms. Evans and Ted about "character witnesses [to] use at th[e] trial." In two letters dated January 14 and 22, 1998, Mr. Rahmati asked Acklin to identify witnesses to subpoena. He followed those two letters with another one on April 3, 1998, assuring Acklin he was "continuing to work on [the] case as [wa]s everyone in [his] office." Mr. Rahmati was reviewing the forensic evidence, but he requested that Acklin respond with "anything else that . . . may be beneficial to [the] case." Acklin responded to Mr. Rahmati's April 3 letter with a list of nine potential character witnesses, whom Mr. Rahmati promised to contact.

Besides these letters to Acklin, on May 28, 1997, Mr. Rahmati wrote to Ms. Evans. He updated her that the state trial court denied the motions to suppress evidence and change venue. And he assured her that he would "continue work on [the] case," advising that "a poll of Madison County residents" would be Acklin's "best chance" for a change of venue.

The third category was Ms. Evans's medical records, which documented how she was admitted to the hospital for her injuries from Ted pushing her out of a window. And the fourth category was the billing statement. It listed each of the payments Ms. Evans and Ted made over trial counsel's two years working on the case, in addition to the tasks trial counsel completed. By the time of Acklin's trial, Ms. Evans was billed for more than four hundred hours of work.

### 2. The Rule 32 Court Denied Acklin's Motion for Postconviction Relief

After the evidentiary hearing, the rule 32 court denied Acklin's motion for postconviction relief.  Because Acklin's financial-conflict-of-interest claim was based on *Sullivan*, the rule 32 court began by setting out the *Sullivan* test.  Under *Sullivan*, the rule 32 court explained, Acklin had the burden to show (1) "an actual conflict of interest" that (2) "adversely affected his lawyer[s'] performance."  "[S]how[ing] both" meant that "prejudice may be presumed."

Although Acklin argued that he met both parts of the *Sullivan* test and was entitled to a presumption of prejudice, the rule 32 court disagreed.  It decided that he fell short because he failed to prove that there was an actual conflict of interest, and, even if there was, any conflict did not have an adverse effect on his trial counsel's performance.  Because Acklin didn't meet his burden, the rule 32 court concluded, he wasn't entitled to relief on his *Sullivan*-based claim that a financial conflict of interest presumptively prejudiced the result in his case.

### 3. The State Appellate Court Affirmed the Denial of Acklin's Motion for Postconviction Relief

Acklin appealed the rule 32 court's order, again asserting that he was entitled to relief under *Sullivan* because "(1) his attorney[s] had an actual conflict of interest, and (2) the conflict of interest adversely affected the attorney[s'] representation."  But the state appellate court affirmed the rule 32 court's denial of Acklin's

*Sullivan*-based financial-conflict-of-interest claim. *Acklin v. State*, 266 So. 3d 89, 100–13, 121 (Ala. Crim. App. 2017).

The state appellate court began by outlining the *Sullivan* test. *See id.* at 106–07. *Sullivan*'s first factor—an actual conflict of interest—required Acklin to show that his trial counsel "actively represented conflicting interests" or "place[d themselves] in a situation inherently conducive to divided loyalties." *Id.* at 106 (marks and citations omitted). If he could show an actual conflict of interest, the state appellate court explained, *Sullivan*'s second factor— the conflict had an adverse effect on his trial counsel's performance—required him to show that trial counsel "made a choice between possible alternative courses of action" because of the conflict. *Id.* (marks and citation omitted).

Applying the *Sullivan* test, the state appellate court concluded that (1) there was no actual conflict, and (2) even if there was, any conflict did not have an adverse effect on trial counsel's performance. *Id.* at 107–13. As to the actual-conflict-of-interest factor, the state appellate court explained that there was no actual conflict because Ted's threat when Mr. Rahmati confronted him about Ms. Evans's abuse allegations—that he was "done" with Acklin and "helping with th[e] case"—wasn't necessarily a threat to stop paying trial counsel if they presented evidence of the abuse. *Id.* at 108. And there was no actual conflict of interest because, by the time Ted made the threat two days before trial, Acklin's trial counsel had no expectation that they would be paid what they were owed for representing him. *Id.*

As to whether any conflict of interest had an adverse effect on trial counsel's performance, the state appellate court explained that there was no adverse effect because the evidence showed Mr. Rahmati and Mr. Gray worked diligently to help Acklin avoid a death sentence despite not being paid what they were owed from the beginning of their representation. *Id.* at 107–08. And there was no adverse effect on his trial counsel's performance because the only reason trial counsel didn't present evidence of Ted's abuse was that Acklin forbade them from mentioning it, and not because of any financial conflict of interest. *Id.* at 108–09, 113.

### E.  Federal Habeas Petition

Acklin petitioned the district court for a writ of habeas corpus under 28 U.S.C. section 2254, alleging that *Sullivan* clearly established he was entitled to relief on his financial-conflict-of-interest claim. According to Acklin, the state appellate court's decision that Acklin wasn't entitled to relief because he failed to satisfy either part of the *Sullivan* test—was based on two unreasonable conclusions. First, Acklin argued, the state appellate court unreasonably found that there was no actual conflict of interest. And second, the state appellate court unreasonably found that any conflict had no adverse effect on his trial counsel's performance.

The district court denied Acklin's petition. First, the district court concluded that Acklin's petition failed because *Sullivan* "[wa]s not clearly established federal law" that applied to his financial-conflict-of-interest claim. *Sullivan*, the district court explained, was limited to conflicts caused by trial counsel's concurrent

representation of multiple defendants.  It did not clearly establish federal law on financial conflicts of interest.  Because *Sullivan* did not clearly establish federal law on financial conflicts, "the [state appellate court] could not have erred in applying it."

"Even if [the *Sullivan*] test applie[d]" outside the multiple concurrent representation context, the district court concluded, "Acklin's claim still fail[ed]" because the state appellate court didn't unreasonably hold (1) there was no actual conflict, and (2) any conflict did not have an adverse effect on his trial counsel's performance.  As to the first *Sullivan* factor, the district court explained, the state appellate court's conclusion that there was no actual conflict wasn't based on an unreasonable determination of the facts, as Acklin argued, because Ted "never unambiguously issued . . . a threat" to stop paying trial counsel.  "[N]either [Mr.] Rahmati nor Acklin ever testified that they understood the comments in that manner."  Given the context of Ted's conversation with Mr. Rahmati, there were multiple explanations for Ted's statement "that ha[d] nothing to do with financial support—e.g., that [Ted] would withdraw emotional or moral support for Acklin, that he would avoid seeing or speaking with Acklin again, or that he would no longer voluntarily . . . plea for mercy" like he did "at the judicial sentencing phase."

As to the second *Sullivan* factor, the district court concluded that the state appellate court's holding that any conflict had no adverse effect on trial counsel's performance also wasn't unreasonable.  The district court explained that, despite any conflict: (1) trial

counsel's testimony and billing statement showed they did everything they could to save Acklin from a death sentence; and (2) the reason trial counsel didn't present evidence of Ted's abuse was because Acklin forbade them from mentioning it.

The district court denied a certificate of appealability. But we granted one on Acklin's *Sullivan*-based financial-conflict-of-interest claim.

## II.    STANDARD OF REVIEW

We review de novo a district court's denial of a section 2254 petition. *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019).

## III.    DISCUSSION

Because Acklin's habeas claim was adjudicated on the merits by the state appellate court, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "erects a formidable barrier" to his request for federal habeas relief. *Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 256 (11th Cir. 2013) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)); *see Sears v. Warden GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) (noting how "we review 'the last state-court decision on the merits'" (quoting *Greene v. Fisher*, 565 U.S. 34, 40 (2011))). "AEDPA permits federal courts to grant habeas relief in only two circumstances after a state court has denied relief." *Downs*, 738 F.3d at 256.

First, AEDPA allows a federal court to grant habeas relief if the state court decision was "contrary to, or involved an

unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established federal law if it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." *Downs*, 738 F.3d at 257 (citation omitted). And it is "an 'unreasonable application' of clearly established federal law if it identifie[d] the correct legal rule from Supreme Court case law but unreasonably applie[d] that rule to the facts of the petitioner's case." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

Under either of these "highly deferential" standards, it is not enough to show that the state court decision was "merely wrong or even clear error." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc) (first quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015); then quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020)). Rather, the state court "decision must be 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Shinn*, 592 U.S. at 118).

"[T]he appropriate 'measuring stick'" when assessing the state court's decision "is 'clearly established federal law,' which means 'the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision.'" *Schwab v. Crosby*, 451 F.3d 1308, 1323 (11th Cir. 2006) (marks omitted) (quoting *Putnam*, 268 F.3d at 1241). The Supreme "Court has held on numerous occasions that it is not 'an unreasonable

application of' 'clearly established [f]ederal law' for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (citations omitted).

Second, a federal court may grant habeas relief if the state court "decision . . . was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). If a petitioner takes this path to federal habeas review, "he must overcome two hurdles." *Presnell v. Warden*, 975 F.3d 1199, 1205 (11th Cir. 2020). One—because the state court's determinations of fact "shall be presumed to be correct" under AEDPA, 28 U.S.C. § 2254(e)(1)—the petitioner must "rebut the presumption . . . with 'clear and convincing evidence'" if he contests specific factual findings, *Presnell*, 975 F.3d at 1205 (quoting 28 U.S.C. § 2254(e)(1)). Two, "he must overcome the deference that we give to the state court's adjudication under [section] 2254(d)." *Id.*; *see Pye*, 50 F.4th at 1035 ("[E]ven if a petitioner successfully carries his burden under [section] 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under [section] 2254(d)(2) . . . ."); *Titlow*, 571 U.S. at 18 ("reiterat[ing] 'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance'" (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

With the AEDPA framework in mind, we turn to Acklin's arguments for why he's entitled to federal habeas relief. As he did in the district court, Acklin contends that he's entitled to relief on his *Sullivan*-based financial-conflict-of-interest claim because the state appellate court unreasonably concluded that there was no actual conflict of interest, and it unreasonably found that any conflict had no adverse effect on trial counsel's performance.

We disagree. *Sullivan* was not clearly established federal law on Acklin's financial-conflict-of-interest claim. And even if it was, Acklin has not shown that the state appellate court unreasonably decided that there was no actual conflict and that any conflict had no adverse effect on trial counsel's performance.

### A. Sullivan *Was Not Clearly Established Federal Law on Acklin's Financial-Conflict-of-Interest Claim*

Acklin is not entitled to federal habeas relief under AEDPA because *Sullivan* was not clearly established federal law on his financial-conflict-of-interest claim. Our starting point is *Sullivan*, which addressed a different type of conflict of interest—one caused by multiple concurrent representation.

There, the habeas petitioner was indicted with two codefendants. *Sullivan*, 446 U.S. at 337–38. The petitioner was tried first, and his trial counsel—the same attorneys who represented his codefendants—chose not to present a defense case because they didn't want to "expos[e]" their "witnesses for the other two trials that were coming up." *Id.* at 338–39; *see also id.* at 350. After his conviction, the petitioner sought federal habeas relief, alleging that

his trial counsel were ineffective because of the multiple concurrent representation. *Id.* at 339–40, 345. The Third Circuit agreed with him because he made a "showing of a possible conflict of interest." *Id.* at 340 (citation omitted).

The Supreme Court reversed because, instead of showing the mere "possibility" of a conflict of interest, "a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350. The Court explained that satisfying this test entitles the petitioner to a presumption that the conflict of interest prejudiced the outcome of his trial. *Id.* at 349–50 ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."). The presumption was necessary because conflicts caused by multiple concurrent representation are especially likely to prejudice the outcome, even though proving prejudice may be difficult. *See id.* at 349 ("[U]nconstitutional multiple [concurrent] representation is never harmless error. . . . [The Court has] refused 'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict." (quoting *Glasser v. United States*, 315 U.S. 60, 76 (1942), *superseded on other grounds as stated in Bourjaily v. United States*, 483 U.S. 171, 181 (1987))).

But while *Sullivan* clearly established federal law for conflicts caused by multiple concurrent representation, the Supreme Court later cautioned in *Mickens* "that *Sullivan* does not expressly apply to counsel's personal conflicts of interests outside the multiple

[concurrent] representation context." *Downs*, 738 F.3d at 265 (citing *Mickens v. Taylor*, 535 U.S. 162, 174–75 (2002)).  In *Mickens*, the petitioner alleged a successive representation conflict—he was tried for murder by lead counsel who had previously represented the victim in a different matter.  535 U.S. at 164–65.  Like in Acklin's case, the state and the *Mickens* petitioner litigated the habeas petition "on the assumption that . . . *Sullivan* would be applicable" to his successive-representation-conflict claim.  *Id.* at 174.

The parties' assumption "was not unreasonable," the Supreme Court acknowledged, in light of some decisions by the circuit courts that extended "*Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts'"—including "when representation of the defendant somehow implicates counsel's personal *or financial interests*."  *Id.* (emphasis added and citations omitted).  But "[i]t must be said," the *Mickens* Court emphasized, "that the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application."  *Id.* at 175.  *Sullivan* "stressed the high probability of prejudice arising from *multiple concurrent representation*," yet "[n]ot all attorney conflicts present comparable difficulties."  *Id.* (emphasis added).  "Whether *Sullivan* should be extended to [other] cases remain[ed], as far as the jurisprudence of th[e] Court [wa]s concerned, an open question."  *Id.* at 176 (noting how "the grounds on which [*Mickens*] was presented to [the Court]" made it unnecessary to delineate *Sullivan*'s scope).

Although *Mickens*'s caution that *Sullivan* does not apply to conflicts (like financial conflicts) outside the multiple concurrent

representation context was dicta, "this [c]ourt has expressly agreed with *Mickens*" twice. *Downs*, 738 F.3d at 265. We first expressly agreed with *Mickens* in *Schwab*, where the petitioner's public defender "insisted that he could not cross-examine" his coworkers about an evidentiary chain-of-custody issue. *Schwab*, 451 F.3d at 1318–19. The petitioner argued that the state habeas court unreasonably applied *Sullivan* in denying his claim that he lacked effective, conflict-free trial counsel because his counsel's loyalties were divided between him and counsel's coworkers. *Id.* at 1319–20, 1322.

But we rejected the *Schwab* petitioner's *Sullivan*-based conflict claim, concluding that the state habeas court's "failure to extend the *Sullivan* rule to th[e] new context" wasn't unreasonable. *Id.* at 1328. "If, as the Supreme Court has told us [in *Mickens*], *Sullivan* does not hold that a presumed prejudice rule applies outside multiple [concurrent] representation circumstances, . . . it cannot be that Supreme Court precedent dictate[d] or clearly establishe[d] that the *Sullivan* rule applies in other conflict situations." *Id.* at 1325 (acknowledging *Mickens*'s discussion of *Sullivan* was dicta, but adopting it because the Supreme Court dicta was "well thought out, thoroughly reasoned, and carefully articulated analysis," and "not [the] subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta"). "[E]ven if the *Mickens* opinion had never been issued, we would [have] reach[ed] the same result" because *Sullivan*, on its face, "did not involve any other context" beyond multiple concurrent representation. *Id.* at 1327–28 ("Take away the statements in *Mickens* and the fact remains that there is

no Supreme Court decision holding that any kind of presumed prejudice rule applies outside the multiple [concurrent] representation context.").

We agreed with *Mickens* a second time in *Downs*, where the habeas petitioner alleged that his trial counsel's contingency fee agreement created a financial conflict of interest. *Downs*, 738 F.3d at 247, 264–65. Like the *Schwab* petitioner—and Acklin—the *Downs* petitioner alleged that his claim was "governed by" *Sullivan*. *Id.* at 265. And, like in *Schwab*, we explained that "*Sullivan* dealt with a conflict of interest in the context of counsel's [multiple] concurrent representation." *Id.* Thus, "it was far from clearly established that *Sullivan* applied to [the petitioner]'s contingency fee claim." *Id.*

The same goes for Acklin's *Sullivan*-based financial-conflict-of-interest claim. Although "*Sullivan* dealt with a conflict of interest in the context of counsel's [multiple] concurrent representation," *id.*, Acklin alleged that a financial conflict divided his trial counsel's loyalties. But "the language of *Sullivan* itself does not clearly establish, or indeed even support," *Sullivan*'s application to a claim that a third-party payer forced trial counsel to choose between their client and their "financial interests." *See Mickens*, 535 U.S. at 174–75. Indeed, the *Downs* petitioner also alleged a financial conflict of interest—that a contingency fee forced counsel to choose between the client and money—and we concluded "it was far from clearly established that *Sullivan* applied to [the] claim." *Downs*, 738 F.3d at 264–65; *see also Reynolds v. Hepp*, 902 F.3d 699,

708 (7th Cir. 2018) ("The Supreme Court itself simply has not extended *Sullivan*, or any constitutional analysis of conflicts of interest, to financial conflicts between attorney and client.").

To be sure, we are not saying that *Sullivan* can *never* be applied to financial-conflict-of-interest claims. Instead, our conclusion is that whether the Supreme Court will apply *Sullivan* to conflict-of-interest claims outside the multiple concurrent representation context—including to financial-conflict-of-interest claims—is "an open question." *See Mickens*, 535 U.S. at 176. And because it's an open question, "it cannot be that Supreme Court precedent dictate[d] or clearly establishe[d] that the *Sullivan* rule applies in other conflict situations"—including the financial conflict of interest Acklin has alleged. *See Schwab*, 451 F.3d at 1325. As the Supreme Court has repeatedly explained, "it is not 'an unreasonable application of' 'clearly established [f]ederal law' for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] Court." *Knowles*, 556 U.S. at 122 (citations omitted); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law." (citations omitted)).

In response, Acklin cites to *Wood v. Georgia*, 450 U.S. 261 (1981), as clearly established federal law that *Sullivan* applies to financial conflicts of interest caused by third-party payer

22-13599              Opinion of the Court                    41

arrangements.  True, *Wood* involved a possible financial conflict caused by a third-party payer arrangement.  *See id.* at 268–71.  But, as we explained in *Schwab* and *Downs* (decided more than twenty years after *Sullivan* and *Wood*), "there [wa]s *no Supreme Court decision* holding that any kind of presumed prejudice rule applies outside the multiple [concurrent] representation context."  *Schwab*, 451 F.3d at 1327–28 (emphasis added); *see Downs*, 738 F.3d at 265.  And *Mickens* (also decided more than twenty years after *Sullivan* and *Wood*), expressly considered *Wood* before cautioning that *Sullivan* hasn't been extended beyond the multiple concurrent representation context.  *See Mickens*, 535 U.S. at 169–70 (discussing *Wood*); *id.* at 174–76 (emphasizing that *Sullivan* doesn't expressly apply outside the multiple concurrent representation context).  The Supreme Court certainly understands its own cases better than we do.

We read *Wood* the same way the Supreme Court did in *Mickens*, and the same way we did in *Schwab* and *Downs*—*Wood* does not extend *Sullivan*'s presumed prejudice rule outside the multiple concurrent representation context.  Instead, *Wood* merely "remand[ed] . . . for further findings concerning a possible due process violation" caused by the "*possibility* of a conflict."  450 U.S. at 262–63, 269–74.  That's not a holding from the Supreme Court that *Sullivan* applies to financial-conflict-of-interest claims.

Besides *Wood*, Acklin directs us to three of our cases—*Dallas v. Warden*, 964 F.3d 1285 (11th Cir. 2020), *Freund v. Butterworth*, 165 F.3d 839 (11th Cir. 1999) (en banc), and *Buenoano v. Singletary*, 963

F.2d 1433 (11th Cir. 1992)—as examples of where we've applied *Sullivan* outside the multiple concurrent representation context. But to the extent these cases applied *Sullivan* outside the multiple concurrent representation context, they cannot clearly establish federal law under AEDPA. "[C]ircuit precedent may not be used 'to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced.'" *Downs*, 738 F.3d at 256–57 (second alteration in original) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)). In any event, even if *Dallas*, *Freund*, and *Buenoano* could clearly establish federal law for AEDPA purposes, these cases did not involve a financial conflict of interest caused by a third-party payer arrangement, much less recognize that the Supreme Court has extended *Sullivan* to conflicts like the one Acklin alleged here. *See Dallas*, 964 F.3d at 1302–04 (where trial counsel represented a state agency in an "unrelated" civil suit); *Freund*, 165 F.3d at 860 ("a successive representation case"); *Buenoano*, 963 F.2d at 1438 (where trial counsel entered into "a book and movie contract" about the case during the penalty phase).

In the end, Acklin brought a *Sullivan* claim based on his trial counsel's financial conflict of interest. But *Sullivan* wasn't clearly established federal law on conflicts of interest (like financial ones) outside the multiple concurrent representation context. "Because it was far from clearly established that *Sullivan* applied to [Acklin's financial-conflict-of-interest] claim," Acklin is not entitled to relief on his *Sullivan*-based claim under AEDPA. *See Downs*, 738 F.3d at 265.

B. *Even if* Sullivan *Was Clearly Established Federal Law on Financial-Conflict-of-Interest Claims, the State Appellate Court Didn't Unreasonably Apply* Sullivan *or Base its Decision on an Unreasonable Determination of the Facts*

Even if *Sullivan* was clearly established federal law on financial-conflict-of-interest claims, *Sullivan* required Acklin to show (1) "an actual conflict of interest" (2) that "adversely affected his lawyer[s'] performance" in order to presume prejudice. 446 U.S. at 350. The first factor required Acklin to "'make a factual showing of inconsistent interests' or point to 'specific instances in the record' to suggest an actual impairment of his . . . interests." *Freund*, 165 F.3d at 859 (quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987)); *see Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 796 (11th Cir. 2020) ("The 'mere possibility of conflict of interest does not rise to the level of a Sixth Amendment violation.'" (quoting *Buenoano v. Singletary*, 74 F.3d 1078, 1086 (11th Cir. 1996))). And the second factor required Acklin to "demonstrate that [the] conflict of interest had an effect upon the representation that he received." *Downs*, 738 F.3d at 265 (citation omitted); *see Freund*, 165 F.3d at 860 (explaining that the petitioner "must show some link" between the conflict of interest and a reasonable, but foregone, defense strategy (citation omitted)).

Applying *Sullivan*, the state appellate court decided that Acklin fell short on both factors: (1) there was no actual conflict, and (2) any conflict did not have an adverse effect on his trial counsel's performance. *See Acklin*, 266 So. 3d at 106–13. Acklin argues that the state appellate court's decision was based on an unreasonable

determination of the facts under section 2254(d)(2)—and that AEDPA deference therefore does not apply to his *Sullivan* claim. *See Jones v. Walker*, 540 F.3d 1277, 1288–89 n.5 (11th Cir. 2008) (en banc).  We disagree.

### 1. The State Appellate Court Didn't Unreasonably Conclude That There Was No Actual Conflict of Interest

We'll start with the state appellate court's conclusion that there was no actual conflict of interest.  The state appellate court explained that there was no actual conflict because, as the rule 32 court found:  (1) Ted's threat, when Mr. Rahmati confronted him about Ms. Evans's abuse allegations, wasn't an explicit threat to stop paying trial counsel if they presented evidence of the abuse; and (2) by the time of Ted's threat, trial counsel had no expectation that they'd be paid what they were owed for the representation. *See id.* at 107–08.  Acklin has not presented clear and convincing evidence that these factual findings were wrong, and he has not shown that the state appellate court's conclusion that no actual conflict of interest existed was based on an unreasonable determination of the facts overall.

### a. Acklin Did Not Present Clear and Convincing Evidence That Ted's Threat Was About Paying Trial Counsel

First, the state appellate court concluded there was no actual conflict because Ted's statement to Mr. Rahmati when confronted about Ms. Evans's abuse allegations two days before the trial— "You tell Nick if he wants to go down this road, I'm done with him" and "done helping with th[e] case"—wasn't an explicit threat by

22-13599                    Opinion of the Court                        45

Ted to stop paying trial counsel. *See id.* at 108. After reviewing the record, we agree with the district court that the state court's finding wasn't clearly and convincingly wrong. *See Pye*, 50 F.4th at 1034–35 (explaining that overcoming AEDPA's presumption of correctness, with clear and convincing evidence, is the petitioner's initial burden when challenging a state court's factual findings). By the time of trial, Ted was helping Acklin in ways that had nothing to do with paying for the representation. Ted helped Acklin emotionally—visiting Acklin in prison "every other Sunday" "if not every Sunday," speaking with Acklin "every week," trying to maintain the type of father-son relationship that he didn't have with his father, and praying for "G-d to help" the victims' families "forgive [his] son." Ted also helped Acklin build a mitigation case by identifying character witnesses and by twice volunteering to plead for his son's life during the penalty phase.[2] It was plausible for the state appellate court to read Ted's threat directed to Acklin as withdrawing his emotional support and help with the mitigation case, rather than his help with paying trial counsel. *Cf. id.* at 1043–44 (concluding that the state habeas court's "plausible" interpretation of three affidavits, "[w]hether or not the best reading" or "most natural" one, wasn't clearly and convincingly wrong).

---

[2] The concurring opinion says that we have misrepresented the facts about Ted's assistance in building a mitigation case. We have not. When Ms. Evans was asked if Ted "also g[a]ve some names of character witnesses" to Mr. Rahmati, she testified, "Yes, he did."

The state appellate court's reading of Ted's threat as not about payment to trial counsel was consistent with the context of Ted's conversation with Mr. Rahmati. Rather than wanting to talk about his fees or what was owed under the retainer agreement, Mr. Rahmati had just discovered potential mitigating evidence—that Ted abused his wife and kids—and invited Ted to his office to *ask him to testify about it*. At no point when Mr. Rahmati was pleading with Ted to testify did he or Ted talk about trial counsel's retainer, fees, or costs. Ted's threat was directed to Mr. Rahmati's request that he testify about the abuse, and not about other topics outside Acklin's mitigation case.

Acklin insists that Ted's "done with" statement was *necessarily* a threat to stop paying trial counsel because the word "done" is "categorical," "mean[ing] that [Ted] would be done helping Acklin and the case *in all ways*." But Acklin puts words in Ted's mouth that he never said. Ted did not threaten trial counsel that he'd stop helping with the case "in all ways." Ted limited the threat to Acklin—saying "tell Nick" and "I'm done with him"—and he made the threat during a meeting about mitigating evidence. It was not clearly and convincingly wrong for the state appellate court to read Ted's threat the way he said it.[3]

---

[3] The concurring opinion oddly reads this section as us explaining "that because Acklin's father, Ted, told [Mr.] Rahmati . . . to tell Acklin 'I'm done with him,' the 'threat' was aimed at Acklin—not at his trial counsel." But we've said no such thing.

b.  *The State Court Did Not Unreasonably Find That, by the Time of Ted's Threat, Trial Counsel Didn't Expect to Be Paid*

Second, the state appellate court also based its conclusion that there was no actual conflict of interests on the rule 32 court's finding that when Ted made the threat just before trial, trial counsel knew they would not get paid what they were owed for the representation. *See Acklin*, 266 So. 3d at 107–08.  We cannot say this finding was clearly and convincingly wrong, either. *See Pye*, 50 F.4th at 1034–35.

Mr. Rahmati testified that he and Mr. Gray had no expectation of being paid for the representation by the time he confronted Ted about the abuse.  To Mr. Rahmati, it "was obvious from Day 1" that Ms. Evans was in financial distress, and he "suspected strongly" that he and Mr. Gray "were never going to get paid." Ms. Evans—despite the retainer agreement requiring the $25,000 payment to be made before Mr. Rahmati completed any work on the case—didn't pay Mr. Rahmati up front during the initial September 30, 1996, consultation.  Ted didn't pay Mr. Rahmati anything up front either, or even sign the retainer agreement.

But Mr. Rahmati started working on Acklin's case the day after being retained despite his strong suspicion that he'd lose money.  Then, when Ms. Evans's payments towards the $25,000 retainer finally trickled in, they were far short of what she owed: $500 in October 1996, $200 in November 1996 and February 1997, and ten payments of $150 or less through the October 1998 trial. Ted, for his part, rarely chipped in over the two years Mr. Rahmati

and Mr. Gray worked on the case: $700 in March 1998, $2,000 in September 1998, and $200 in October 1998. This pattern of mostly "$100- or $200-a-month" payments was "a very strong signal" to Mr. Rahmati that Acklin's parents couldn't afford the retainer. Meanwhile, Acklin wasn't paying trial counsel anything. Because the family was barely paying any of trial counsel's fees and costs, more than $50,000 remained unpaid by the time of trial.

Still, despite expecting to lose tens of thousands of dollars from representing Acklin, trial counsel persisted, researching, drafting motions, and following evidentiary leads. Trial counsel knew that they were not getting paid nearly what they should, but Mr. Rahmati emphasized that he and Mr. Gray weren't representing Acklin for the money. The money "wasn't important" and "it wasn't necessarily about the money." Instead, trial counsel stuck it out for over two years because Mr. Rahmati "gave [his] word" to Ms. Evans that he'd defend her son. It was enough, Mr. Rahmati explained, that "Ms. Evans . . . seemed to be trying, even though it was $100 a month." Her trying was "all [he] c[ould] ask for."

True, as Acklin emphasizes, there was also evidence from the rule 32 hearing that Mr. Rahmati asked Ted to pitch in for his son's defense both before and after trial. But the question AEDPA requires us to answer is not whether there was evidence that would've supported a different finding by the state appellate court. Rather, under AEDPA, we must ask if what the state appellate court actually found—that, by the time of trial, trial counsel didn't expect to be paid—was clearly and convincingly wrong. *See* 28

U.S.C. 2254(e)(1); *Pye*, 50 F.4th at 1034. Based on Mr. Rahmati's testimony and the other evidence, the answer is no.

★          ★          ★

In short, Acklin hasn't shown by clear and convincing evidence that the state court's key factual findings (that Ted didn't explicitly threaten to stop paying and that counsel had already given up on full payment by that time anyway) were wrong—or that the state appellate court's conclusion that no actual conflict of interest existed was based on an unreasonable determination of the facts. So even if *Sullivan* was clearly established federal law on Acklin's financial-conflict-of-interest claim, Acklin has not met his burden of showing that he is entitled to habeas relief under *Sullivan*. *See* 28 U.S.C. § 2254(d)(2), (e)(1); *Sullivan*, 446 U.S. at 350; *see also Pye*, 50 F.4th at 1035.

## 2. The State Appellate Court Didn't Unreasonably Conclude That Any Conflict Had No Adverse Effect on Trial Counsel's Performance

The state appellate court also held that Acklin failed to satisfy *Sullivan*'s second factor because any conflict did not have an adverse effect on his trial counsel's performance. *See Acklin*, 266 So. 3d at 107–13. The state appellate court found no adverse effect on trial counsel's performance because: (1) despite any conflict, trial counsel never let a lack of payment deter them from diligently representing Acklin; and (2) the only reason they didn't present evidence of Ted's abuse was because Acklin forbade them from presenting it. *See id.*

### a.  The State Court Did Not Unreasonably Find That, Despite A Lack of Payment, Trial Counsel Worked Diligently to Defend Acklin

First, the state court found that any conflict had no adverse effect on trial counsel's performance because, from the beginning of their representation, the "lack of payment did not curtail their efforts" to defend Acklin.  *See id.* at 107.  Considering the evidence of trial counsel's exhaustive work on Acklin's case and preparation for his trial--despite never receiving more than a fraction of the amount due for their services—this finding wasn't clearly and convincingly wrong.  *See Pye*, 50 F.4th at 1034–35.

Evidence from the rule 32 hearing showed that, throughout the case, trial counsel researched case law and prepared a variety of motions—including for discovery, to suppress or exclude evidence, to dismiss the indictment, and for a change of venue based on pretrial publicity—aimed at bettering Acklin's chances of avoiding a conviction or death sentence.  Trial counsel even subpoenaed local news sources for records they could use to support the venue motion.  Mr. Rahmati sent Ms. Evans and Acklin multiple letters updating them on these motions and other case developments, assuring them that he'd keep working on the case.

Trial counsel also focused on "many fronts" when investigating evidence for trial.  Not only did trial counsel subpoena the state's witnesses, for example, but they also investigated whether Acklin's marijuana and alcohol use before the murders, combined with his diabetes, could be used to show that he lacked the intent

to murder. To that end, trial counsel obtained Acklin's medical records, and they obtained and reviewed Dr. Maier's report, evaluating whether substance abuse significantly impaired Acklin's judgment during the murders. And Mr. Rahmati separately consulted another expert—Dr. Noggle—about Acklin's diabetes and substance abuse.

Besides the substance-abuse front, trial counsel "looked at any and all mitigation avenues that [they] had." "[F]rom the very beginning" of the case, Mr. Rahmati explained, the mitigation investigation included looking into Acklin's background and potential character witnesses. For example, Mr. Rahmati's letters asked Acklin and his parents to identify character witnesses that he should contact or subpoena. Trial counsel contacted the witnesses Acklin and his parents identified, interviewed them, and ultimately presented six of them at the penalty phase.

Both Mr. Rahmati and Mr. Gray also described how they met with Acklin or his parents many times, as Mr. Gray put it, to "get[] as much information about his background, his history, [and] who he was" as they could. During these meetings, Mr. Rahmati "would have asked [Acklin], [he] would have asked [Acklin's] mom, [and he] would have asked [Acklin's] father" for any information that would be helpful. One question Mr. Rahmati "absolutely" asked was whether there had been any abuse in the family.

Trial counsel's testimony about these diligent efforts—researching case law, drafting and filing motions, reviewing discovery, issuing subpoenas, consulting Acklin and his family,

interviewing witnesses, and investigating exculpatory and mitigating evidence—was corroborated by their billing statement. The billing statement showed that trial counsel spent more than four hundred hours on Acklin's case before the October 19, 1998 trial started. Mr. Rahmati testified that the billing statement "certainly" reflected the minimum amount of time he and Mr. Gray worked on Acklin's case, and he doubted that the billing "reflect[ed] . . . all the time."

Even when Ted threatened to be "done with" Acklin and "done helping with" Acklin's case if they introduced evidence of Ted's abuse, counsel did not allow those threats to interfere with their representation of Acklin. Mr. Rahmati met with Acklin, confirmed Ms. Evans's allegations of abuse, informed Acklin of the confrontation with Ted, and tried to persuade him to introduce evidence about Ted's abuse at the penalty phase. Based on trial counsel's testimony and their billing statement, the state court wasn't clearly and convincingly wrong that a lack of payment did not affect counsel's efforts to diligently represent Acklin. Mr. Rahmati and Mr. Gray "did everything [they] absolutely, positively could do, and then some"—even with Ted's threat.

### b. *The State Court Did Not Unreasonably Find That Acklin Was the Only Reason Trial Counsel Didn't Present the Domestic Abuse Evidence*

Second, the state appellate court's conclusion that any conflict had no adverse effect on trial counsel's performance was also based on the lower court's finding that Acklin—by forbidding trial

counsel from presenting evidence of Ted's abuse—was the only reason they didn't present it. *See Acklin*, 266 So. 3d at 108, 113. Like the other findings, this one too is not clearly and convincingly wrong. *See Pye*, 50 F.4th at 1034–35.

Trial counsel's testimony and the written acknowledgment both supported the state court's finding that trial counsel would've readily presented the domestic abuse evidence but for Acklin's express instruction not to. After confronting Ted about Ms. Evans's abuse allegations, Mr. Rahmati testified, he told Ted that he would "do *whatever* [he] need[ed] to, to get [Ted] to th[e] sentencing phase." He meant it. Mr. Rahmati went to Acklin, told Acklin everything Ms. Evans disclosed about the domestic abuse, and told Acklin everything Ted said when confronted about it. Then, once Acklin confirmed that Ms. Evans's allegations were true, Mr. Rahmati explained to Acklin that the evidence was "important" and "felt certainly that [he] would need to try to introduce it."

But despite Mr. Rahmati's insistence that Acklin let him present the domestic abuse evidence, Acklin wouldn't have it. He instructed Mr. Rahmati not to subpoena Ted or introduce evidence of his abuse. Mr. Rahmati informed Acklin that he could call other witnesses with knowledge of the abuse, including his mother or his brothers. But Acklin instructed Mr. Rahmati not to introduce evidence of Ted's abuse under any circumstances. And Acklin gave that instruction because Ted's domestic abuse "didn't cause [him] to be here" and he didn't "want to ruin [his parents'] lives or have anything like this to come out on them." Indeed, Mr. Rahmati "felt

so strong[ly]" that he "need[ed] to try to introduce th[e] evidence" that he drafted a written acknowledgment memorializing Acklin's instruction.  That acknowledgment—signed by Acklin—confirmed trial counsel were *"prepared to offer* [the domestic abuse evidence] on [Acklin's] behalf" because it could be "considered by a jury in mitigation," but Acklin had "expressly forbidden them to mention or present such evidence."

Acklin maintains that it was unreasonable for the state appellate court to rely on the written acknowledgment.  In his view, the written acknowledgment did not effectively "waive" the conflict of interest because Mr. Rahmati didn't disclose that one existed before having him sign it.  Rather than "curing" the conflict, the argument goes, the acknowledgment "simply state[d] that Acklin d[id] not want evidence of the abuse presented."

But Acklin misses the point.  The state appellate court didn't find that Acklin "waived" or "cured" the conflict.  Instead, the state appellate court found that any financial conflict had no adverse effect on trial counsel's performance because Acklin wouldn't have let them present the abuse evidence *under any circumstances*.  *See Acklin*, 266 So. 3d at 113 ("Acklin voluntarily signed a statement acknowledging that he had prohibited his attorneys from introducing evidence of the alleged abuse.").  The written acknowledgment supported that finding because, as Acklin admits, it expressly "state[d] that Acklin d[id] not want evidence of the abuse presented."  In any event, even if the state court couldn't consider the written acknowledgment, its finding was still supported by

Mr. Rahmati's undisputed testimony confirming that Acklin directed trial counsel not to introduce evidence of Ted's abuse, despite Mr. Rahmati imploring Acklin to let it in because it was mitigating evidence that could help his case.

★    ★    ★

Acklin hasn't shown the state court's factual findings supporting its conclusion that any conflict had no adverse effect on trial counsel's performance were clearly and convincingly wrong. And he does not otherwise argue that the state appellate court unreasonably applied *Sullivan* or based its conclusion on *Sullivan*'s second factor on an unreasonable determination of the facts. So, even if *Sullivan* was clearly established federal law on Acklin's financial-conflict-of-interest claim, he failed to meet his burden of showing the state appellate court's conclusion  on *Sullivan*'s second factor was unreasonable.[4]

---

[4] As a fallback, Acklin argues that even if his *Sullivan* claim fails, he can still show ineffective assistance of counsel under *Strickland*. But we agree with the concurring opinion that the state appellate court's finding that there was no reasonable probability of a different result if trial counsel presented evidence of Ted's abuse was not unreasonable. *See Acklin*, 266 So. 3d at 112–13 (determining there was no reasonable probability of a different result because the state trial court found significant aggravating factors and evidence of Ted's abuse would've been entitled to little mitigating weight, considering Acklin's age at the time of the murders); *see also Tompkins v. Moore*, 193 F.3d 1327, 1337 (11th Cir. 1999) ("[W]here there are significant aggravating circumstances and the petitioner was not young at the time of the capital offense, evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight."

## IV.    CONCLUSION

The district court correctly concluded that AEDPA precludes federal habeas relief on Acklin's *Sullivan* claim.  *Sullivan* was not clearly established federal law on his financial-conflict-of-interest claim.  And even if it was, the state appellate court still did not unreasonably conclude there was no actual conflict that had an adverse effect on trial counsel's performance.

The district court's order denying Acklin's federal habeas petition is **AFFIRMED**.

---

(marks and citation omitted)); *Mills v. Singletary*, 63 F.3d 999, 1025–26 (11th Cir. 1995) (reasoning similarly).

22-13599          WILSON, J., Concurring                    1

WILSON, Circuit Judge, Concurring:

I concur with the majority that the law is not clearly established about whether *Cuyler v. Sullivan*, 446 U.S. 335 (1980), applies to conflicts involving third-party payors. I also agree that Nicholas Acklin has not provided clear and convincing evidence required to overcome our deference to the state appellate court's factual determinations[1] under 28 U.S.C. § 2254(d)(2).

I write separately to address two issues. First, I address why I would find that the conflict of interest created by the third-party payor arrangement with Acklin's father, Theodis (Ted) Acklin, caused Acklin's counsel to be deficient under *Strickland v.*

---

[1] Even though Acklin does not overcome the high standard to show the state appellate court's factual determinations were unreasonable, I have a few concerns with the majority's framing of those facts. First, the majority explains that because Acklin's father, Ted, told Behrouz Rahmati, Acklin's counsel, to tell Acklin "I'm done with him," the "threat" was aimed at Acklin. Although the majority does not say Ted's threat was aimed at trial counsel, that can be inferred from the state appellate court's decision given that Ted's payments to Rahmati were his main contribution to and involvement with Acklin at the time. The majority states, "Ted helped Acklin emotionally," with weekly visits in prison, but this is based on Ted's own testimony. There is little to no other evidence that speaks to the emotional support that Ted provided from anyone other than Ted himself.

Second, the majority misrepresents the facts about Ted's assistance in building a mitigating case. When Rahmati was asked whether the witnesses called at the penalty phase were people that Ted and Velma suggested as character witnesses, Rahmati responded: "Either Ted or Velma or Nick." Velma later testified that Acklin's father had given the name of one person, before the attorney conducting the cross-examination was asked to rephrase his line of questioning to avoid hearsay.

*Washington*, 466 U.S. 668 (1984), but that deficiency did not prejudice the outcome of Acklin's case.  Second, I explain why the Supreme Court should concretely address whether a presumption of prejudice applies to conflicts other than multi-defendant representation—including conflicts involving third-party payors.

## I.

To prevail on a *Strickland* claim, Acklin must show: (1) his counsel's performance was deficient because of the conflict, and (2) that deficient performance proved prejudicial. *See* 466 U.S. at 687.  I would find that the conflict resulted in deficient performance by Acklin's counsel, but the deficient performance was not prejudicial.

### A.

Acklin argues that his counsel was ineffective because a conflict of interest arose from his father's role as a third-party payor and subsequent threat to withhold further payment if Acklin's counsel, Behrouz Rahmati, presented evidence of Ted's abuse.

The facts of this case concern me.  A third-party payor (Ted)—with whom counsel had not entered into a formal agreement—had significant access to counsel, influenced what evidence was presented at trial, and was relied on during crucial moments of the trial and sentencing, despite multiple allegations that Ted (the payor) abused Acklin and his family members.

Two days before trial, Velma, Acklin's mother, disclosed to Rahmati that Ted had severely abused her and their children,

22-13599                WILSON, J., Concurring                3

including Acklin.  She shared that "if [Ted] was mad at the kids, he would hold them down, put a gun to them, threaten to shoot them, threaten to kill them."  She recounted that Ted once "shoved her out of the window" of their house, leaving her to "[fall] to the ground."[2]  Following his meeting with Velma, Rahmati met Ted and asked him about the abuse.  Rahmati first told Ted about his conversation with Velma and how Velma had described that Ted had physically abused Velma, Acklin, and his siblings.  According to Rahmati, Ted "wasn't happy."  Ted "didn't appreciate the idea that his ex-spouse had disclosed these facts to" Rahmati.  Rahmati explained to Acklin that Ted was visibly angry, saying "You tell [Acklin] if he wants to go down this road, I'm done with him."

The next day, Rahmati met with Acklin to debrief the conversations with Velma and Ted.  Rahmati shared that he had learned about the abuse and explained that this information could be used as mitigating evidence at the potential sentencing phase.  Acklin, however, hesitated to introduce the evidence.  He explained to Rahmati that he did not "want to ruin [his family members'] lives or have anything like this to come out on them."

"The effective assistance of counsel demands not only a minimally competent lawyer, but also counsel unburdened by a

---

[2] Additional evidence, discovered in the post-conviction proceedings, illustrates the abuse Acklin and his siblings experienced.  Records from the Alabama Department of Human Resources describe an incident in which Ted admitted pulling a gun on his sons while stating, "I brought you into the world, and I can take you out of it."

conflict of interest that impedes zealous representation." *Dallas v. Warden*, 964 F.3d 1285, 1302 (11th Cir. 2020). A defendant "must establish that no competent counsel would have taken the action that his counsel did take." *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) (quotation marks omitted).

I agree with Acklin that a conflict emerged, and the conflict caused his counsel to be deficient. *See Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) (explaining that actual conflict may emerge where a defense attorney engages or works with non-parties whose interests are adverse to the client).[3] The meeting between Rahmati and Acklin strongly suggests that Rahmati placed not only his own interests, but Ted's interests, before the interests of his client—Acklin. Rahmati should have recognized that Ted expressed an interest conflicting with Acklin's.

The evidence of abuse suggested the need for further investigation, but Rahmati did not investigate. Instead, Rahmati's investigation following the disclosure was non-existent. Rahmati did not investigate Velma's allegations, which were later confirmed by Acklin, beyond speaking with Ted, the alleged perpetrator. Finding Rahmati's representation sufficient, the state appellate court noted the hours Rahmati and his co-counsel, Kevin Gray, spent preparing for trial, as well as the interviews conducted with Acklin's family, character witnesses, and experts before the abuse

---

[3] In *Bonner v. City of Prichard*, we adopted all decisions of the former Fifth Circuit handed down before October 1, 1981, as binding precedent. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

22-13599                 WILSON, J., Concurring                 5

disclosure.  But these actions do not make up for the deficiency of not introducing this piece of mitigating evidence—evidence directly affected by the conflict.[4]  The limitations on the investigation did not stem from reasonable professional judgment.

Rahmati should have at least disclosed the conflict and then obtained a valid waiver of Acklin's right to conflict-free counsel. Rahmati did neither.[5]  Instead, Rahmati took an alarming action

---

[4] The state appellate court relied on *Schriro v. Landrigan*, (as does the Commissioner), in finding that a defendant may not bring an ineffective assistance of counsel claim for failing to present mitigating evidence when that failure to do so was at the defendant's request.  550 U.S. 465 (2007).  But the facts in *Landrigan* differ significantly from the facts here.  In *Landrigan*, the defendant waived the introduction of mitigating evidence in the presence of the trial court.  *Id.* at 478–80.  The trial court questioned the defendant directly about his desire to introduce mitigating evidence and the defendant refused.  *Id.* Here, the waiver was drafted outside the purview of the court, with only Acklin and Rahmati present.

[5] The state appellate court's treatment of the waiver is problematic for two key reasons.  First, while Rahmati testified that Acklin consented to the third-party payor arrangement, there are few details illuminating what this consent entailed.  Consenting to a third-party payor arrangement and waiving one's right to conflict free counsel are not synonymous.  The state appellate court did not address this distinction.  A waiver should only be considered valid where it was "knowing, intelligent, and voluntary." *United States v. Valois*, 915 F.3d 717, 727 (11th Cir. 2019) (quotation marks omitted).  A waiver is knowing and intelligent if it meets the three-part test outlined in *United States v. Garcia*, 447 F.3d 1327, 1337 (11th Cir. 2006).  The record does not support finding that Acklin: (1) knew that Ted's involvement and statement constituted a conflict; (2) realized the potential consequences of this conflict; or (3) was aware of his right to obtain other counsel in face of the conflict.  Second, despite not engaging in an analysis under *Valois* or *Garcia*, the state appellate court relied on the waiver to foreclose a full analysis of Acklin's ineffective assistance of

after securing the waiver.  Despite his knowledge of the abuse—which Velma, Acklin, and Acklin's brother had corroborated—Rahmati relied heavily on Ted, the alleged abuser, during both the trial and at sentencing.  In fact, Ted was the only witness to testify at sentencing.  Despite having corroborating evidence of Ted's abuse, Rahmati's decision to put Ted on the stand, shows Rahmati's deficient representation.

Based on these facts, I would find that Rahmati was deficient because of the conflict.  Rahmati's representation of Acklin fell outside the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. His actions do not support a finding that he acted as competent counsel would.  *See Newland*, 527 F.3d at 1184.

*B.*

To establish prejudice, a criminal defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "In the capital sentencing context, the prejudice inquiry asks whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not

counsel claim.  According to the state appellate court, because "there was uncontradicted evidence that counsel's decision not to introduce evidence of the abuse was at the express direction of Acklin," Acklin could not later try to hold counsel accountable for doing as he wished.  This conclusion draws from incomplete analysis.

warrant death." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1041 (11th Cir. 2022) (en banc) (quotation marks omitted and alteration adopted). *Pye* instructs this court to consider the totality of available mitigation evidence—both from trial and the habeas proceeding—and reweigh it against the aggravating evidence. *Id.* at 1042.

All the state courts that heard Acklin's case asserted that the aggravating circumstances would be particularly difficult to overcome, stressing the violent nature of the underlying offense.[6] Indeed, the state appellate court reviewed the evidence of Ted's abuse and was not convinced that Acklin's sentence would have been different. In making its decision, the state appellate court relied on the trial court's determination that "[t]he abuse Acklin endured at the hands of his father clearly had no effect on Acklin's ability to work, maintain relationships, or to function in society." The state appellate court concluded that Acklin did not meet *Strickland*'s requirement of demonstrating any reasonable probability that the abuse would have altered the weighing of the evidence. I agree. Given the nature of this capital offense, I do not believe the evidence of abuse in this case would alter the court's weighing of the evidence of each aggravating factor.

---

[6] The aggravating circumstances here included: (1) that the defendant knowingly created a great risk of death to many persons; and (2) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.

## II.

As noted by the majority, in *Sullivan*, the Supreme Court held that where a defendant has identified a conflict of interest that "actually affected the adequacy of his representation," the defendant is entitled to a presumption of prejudice. 446 U.S at 349–50. But the Court has not yet concretely extended this rule to third-party payor situations. The closest the Court has come is in *Wood v. Georgia*, 450 U.S. 261 (1981). In *Wood*, the "petitioners were represented by their employer's lawyer, who may not have pursued their interests single-mindedly." *Id.* at 271–72. Instead, counsel appeared to be advancing arguments that conflicted with the arguments in the petitioners' best interest for the benefit of the third-party payor (the employer). *Id.* The Court noted the petitioners' constitutional rights would be implicated if "counsel was influenced in his basic strategic decisions" by the interests of the third-party payor. *Id.* at 272. Because the parties did not argue the possibility of an actual conflict, the Court sidestepped the issue, remanding for a hearing to determine whether, because of the involvement of a third-party payor, the attorney "may not have pursued [the clients'] interests single-mindedly." *Id.* at 271–73.

This case provides an opportunity for the Court to address whether *Sullivan*'s presumption of prejudice applies when a third-party payor agreement creates a conflict that adversely affected counsel's performance. Defendants like Acklin, along with the circuits, would benefit from the Supreme Court's guidance.